## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **CAILA FRENCH and JAZMIN JOHNSON,** | : | **CIVIL ACTION NO.** |
| | : | |
| | : | **3:22-cv-01199 (    )** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **THE TRUSTEES OF TRINITY COLLEGE d/b/a TRINITY COLLEGE,** | : | |
| | : | |
| **Defendant.** | : | **September 23, 2022** |
| | : | |

## COMPLAINT

Plaintiffs Caila French and Jazmin Johnson, by and through their counsel, hereby allege the following:

## I.    PRELIMINARY STATEMENT

1.    This action seeks damages against the Defendant for discrimination on the basis of sex in violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681, as well as negligence, breach of contractual obligations, and reckless misconduct.

2.    This action arises out of two young women who were students at Trinity College from fall 2017 to spring 2021.

3.    Trinity is a highly ranked liberal arts college. However, students report that Trinity also has a history of tolerating a pervasive culture of sexual harassment and assault on its campus.

4.    Almost immediately upon matriculating to campus her freshman year, Plaintiff Jazmin Johnson was sexually assaulted in her dorm by another Trinity student.  Trinity had actual notice that Ms. Johnson was assaulted and had an obligation to promptly and thoroughly investigate the assault and, upon a finding of responsibility, discipline the Student-Attacker.

#

#

Trinity's failure to do so enabled this same Student-Attacker to rape Plaintiff Caila French in her dorm room the summer after her freshman year.

5.      This Student-Attacker's history of sexual harassment and assault of other students was well known to Trinity.

6.      Unbeknownst to Ms. French and Ms. Johnson (who did not know one another) but certainly known to Trinity, Ms. Johnson and Ms. French – and potentially others as well – had pending complaints against the same Student-Attacker at the same time.  Both women separately reported to Trinity multiple times that this Student-Attacker had shown a pattern of sexually violent behavior towards numerous women since his arrival on campus.  Instead of pursuing any investigation based on these reports, Trinity continuously placed the burden on *Ms. French and Ms. Johnson* to do what the Title IX office should have done: investigate promptly and hold their assailant accountable.

7.      Had Trinity not been deliberately indifferent to multiple reports of sexual assault committed by the same Student-Attacker, Ms. French's rape – and the trauma it caused, which in turn resulted in her deprivation of access to educational opportunities or benefits – could have been prevented.

8.      Instead, Trinity subjected these women to a three-ring circus over the course of *years*, complete with a revolving door of Title IX Coordinators (at least five) who along the way lost both of their files, insisted that they isolate themselves from everyone (even their parents) during the investigation with the exception of a single support person, and otherwise made their young lives already marred by sexual violence a living hell.

#

#

9.      Although Trinity was first notified of Ms. Johnson's assault in September 2017, Trinity did not initiate its investigation until October 2018, and it did not provide her with a final decision until May of 2019 – *17 months* and an entire school year after she first reported the assault. After these 17 months, Ms. Johnson finally received a decision that her attacker was indeed found responsible for sexually assaulting her.  The only action Trinity took against the Student-Attacker was to suspend him for a period of one year – less time that it took to even conduct and complete the investigation that concluded he assaulted her.

10.     Similarly, Ms. French first brought her complaint to mandated reporters in fall 2018 and then to the Title IX office in spring 2019.  Yet, Trinity did not initiate an investigation into her reported rape until spring 2020 – a delay of over one year.  Ms. French did not receive a final decision on her complaint, which concluded that the Student-Attacker raped her, until April 2021 – *two years* after her report to Title IX, and after she had concluded her senior year at the college.

11.     The Plaintiffs now bring this case to hold Trinity responsible under Title IX and other laws for its deliberate indifference, neglect, and tolerance for the sexually hostile environment to which they were subjected as students.

## II.     <u>PARTIES</u>

12.     Plaintiff Caila French resides in Pasadena, California.

13.     Plaintiff Jazmin Johnson resides in Portland, Maine.

14.     Defendant Trinity College ("Trinity") is a private liberal arts college located in Hartford, Connecticut.

15.     Trinity receives, and at all relevant times did receive, federal financial assistance and is therefore subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681.

\#

\#

## III.   **JURISDICTION AND VENUE**

16.   On or about April 22, 2022, the parties entered into a tolling agreement which provided that the statute of limitations on all claims Plaintiffs were entitled to bring was tolled for the period of time during which the agreement was in effect.

17.   On September 9, 2022, Trinity gave written notice of its intention to terminate the tolling agreement.

18.   Pursuant to the terms of that agreement, the agreement expires on September 24, 2022.

19.   This Court has jurisdiction over the Plaintiffs' federal law claims pursuant to 28 U.S.C. § 1331.

20.   This action arises under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681.

21.   This Court has supplemental jurisdiction over the Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, since those claims are so related to their federal law claims that they form part of the same case or controversy.

22.   Venue is proper within this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), because the Defendant is located in Connecticut and the conduct underlying the Plaintiffs' claims occurred in Connecticut.

## IV.   **JURY DEMAND**

23.   Plaintiffs demand a trial by jury.

#

\#

## V.    GENERAL ALLEGATIONS

### General Requirements of Title IX

24.    Title IX is a comprehensive federal law that prohibits any federally funded education program or activity, such as Trinity, from discriminating on the basis of sex.

25.    Title IX protects students from all forms of sex discrimination, including sexual harassment and gender discrimination.

26.    The United States Department of Education ("DOE") Office for Civil Rights ("OCR") enforces Title IX.

27.    The DOE's Title IX regulations are codified at Volume 34, Code of Federal Regulations, Part 106.

28.    34 C.F.R. § 106.31(b) provides that an educational institution:

> shall not, on the basis of sex: (1) treat one person differently from another in determining whether any such person satisfies any requirement or condition for the provision of such aid, benefit or service; (2) provide different aid, benefits or service or provide aid, benefits or service in a different manner; (3) deny any person any such aid, benefits or service; (4) subject any person to separate or different rules of behavior, sanctions, or other treatment; … (7) otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.

29.    34 C.F.R. § 106.38(a) provides that an educational institution that makes employment available to any of its students shall assure itself that such employment is made available without discrimination on the basis of sex.

30.    The OCR has published guidance to schools to assist in interpreting and complying with Title IX, including through its Title IX Resource Guides, and its Question and Answers on Title IX, including on Sexual Harassment and Sexual Violence.  These publications require adherence to the following procedures to achieve compliance with Title IX:

\#

\#

a.   Title IX Rule states in § 106.8(a): "Each recipient must designate and authorize at least one employee to coordinate its efforts to comply with its responsibilities under this part, which employee must be referred to as the "'Title IX Coordinator[1].'"

b.   Each recipient is responsible for ensuring that its grievance procedures satisfy the Title IX Rule. See § 106.8(c) ("A recipient must adopt and publish grievance procedures that provide for the prompt and equitable resolution of student and employee complaints alleging any action that would be prohibited by this part and a grievance process that complies with § 106.45 for formal complaints as defined in § 106.30")

c.   Under the Title IX Rule, recipients must promptly respond to a report that an individual has been allegedly victimized by sexual harassment,

d.   the Rule permits Title IX Coordinators to sign a formal complaint, regardless of whether a complainant is "participating or attempting to participate" in the school's education program or activity. A Title IX Coordinator's decision to sign a formal complaint (or not) is evaluated under the deliberate indifference standard: whether the decision was clearly unreasonable in light of the known circumstances.

e.   Title IX Rule, at § 106.45(b)(6)(i), requires postsecondary institutions to hold a live hearing with the opportunity for each party's advisor to conduct cross-examination of parties and witnesses

---

1 Prior to August 14, 2020, the regulation provided for the designation of a "responsible employee" as opposed to a Title IX Coordinator.

#

#

f.   Title IX regulations require that the records described in 34 C.F.R. § 106.45(b)(10) must be maintained for a period of seven years.

g.   Upon receipt of a Title IX complaint, a school is required to take immediate and appropriate steps to investigate.

h.   A school's grievance procedures must include adequate, reliable, and impartial investigation of complaints, including the opportunity for both the complainant and alleged perpetrator to present witnesses and evidence.

i.   The Title IX Coordinator is responsible for ensuring that Title IX complaints are processed appropriately, including coordinating the school's efforts to accept and appropriately respond to all complaints of sex discrimination.  The Title IX Coordinator is generally in the best position to evaluate confidentiality requests in the context of providing a safe, nondiscriminatory environment.

j.   Title IX requires schools to respond promptly to a complaint and recommends 60 days within which to investigate, hold a hearing and decide which actions the school will take to remedy the situation, including imposing sanctions against the accused;

k.   Even if there is no complaint, when a school knows or should know of possible sexual misconduct, harassment, or gender discrimination, it is required to take immediate and appropriate steps to investigate that conduct or otherwise determine what occurred.  A school's failure to investigate and take prompt and effective corrective actions in such cases violates Title IX.  A school should not wait to take

steps to protect its students until they have already been deprived of educational opportunities.

l.  Title IX requires a school to protect the complainant and ensure his or her safety as necessary, including taking interim steps before the final outcome of any investigation, and these steps should be taken promptly once it has notice of an allegation.  If a school delays in responding to allegations of sexual violence or responds inappropriately, the school's own inaction may subject the student to a hostile environment.

m.  A school violates a student's rights under Title IX regarding student-on-student sexual violence when the following conditions are met: (1) the alleged conduct is sufficiently serious to limit or deny a student's ability to participate in or benefit from the school's educational program, i.e. creates a hostile environment; and (2) the school, upon notice, fails to take prompt and effective steps reasonably calculated to end the sexual violence, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects.

**Trinity's Contractual Obligations Under its Publications**

31.    Trinity sets forth its policies regarding compliance with federal and state laws, student conduct complaints and its processes for student conduct and sexual misconduct complaints in many publications, including its Student Handbook ("Handbook") and Policy on Sexual Harassment, Including Sexual Assault, Domestic Violence, Dating Violence, Stalking, and Retaliation ("Sexual Harassment Policy").  The Sexual Harassment Policy, the Handbook, and other related written documents (the "Trinity Publications") set forth Trinity's policy to comply

#

#

with Title IX, and its investigation procedures for student conduct and sexual misconduct, including but not limited to the following:

a. Trinity College supports the language and intent of Title IX and seeks to comply fully with its requirements.

b. Trinity is committed to maintaining an environment free from discrimination and harassment and has established procedures for the reporting and prompt, equitable, and impartial resolution of sexual harassment reports and complaints, from the initial response to the final result.

c. Maintaining Trinity's commitment to a campus climate where harassment and discrimination are not tolerated is a shared goal, in which both students *and* the college have a responsibility to create an environment free of harassment.

d. Harassment includes, but is not limited to, physical or non-physical behavior, such as assault, abuse, and intimidation.

e. Trinity's Student Handbook defines "Title IX Sexual Harassment" as "conduct on the basis of sex that must satisfy one or more of the following…(3) sexual assault…."

f. The Student Handbook defines "Sexual Assault" as "having or attempting to have sexual contact with another individual without consent or where the individual cannot consent…"  This can include sexual intercourse or other penetration with a body part or object, sexual touching of an individual's body, or attempts to commit sexual assault.

#

#

g.  Trinity is committed to responding to all reports of harassment, abuse, or discrimination and will use all reasonable means to prevent, confront, and eliminate such behavior.

h.  Pursuant to the Sexual Harassment Policy, Trinity possesses disciplinary authority over all Trinity employees and students.

i.  Trinity's Title IX Coordinator is the official with the authority to coordinate the college's compliance with the requirements and responsibilities of Title IX.

j.  The Title IX Coordinator serves as the primary college resource on Title IX requirements and compliance and is charged with providing education and training, overseeing the reporting and complaint process, coordinating the college's investigation and resolution of all reports of sexual harassment, and maintaining centralized records of all reports, formal complaint, investigations, and resolutions in accordance with Title IX.

k.  The Title IX Coordinator has the authority to investigate allegations of violations of Title IX and has the responsibility of ensuring a fair and equitable process exists to address allegations of sexual harassment, sexual assault, and discrimination.

l.  Regardless of whether a complaint is made, Trinity may investigate health, safety or welfare concerns involving Trinity College students, including concerns about sexual violence or harassment. The Title IX Coordinator may exercise the college's independent authority to investigate and address sexual harassment, even in the absence of a formal complaint.

m.  Trinity prohibits sexual misconduct which includes sexual assault.

10

\#

\#

n.  Trinity will follow the procedure described in its Sexual Harassment Policy for reports of sexual misconduct by a student alleged to have occurred at school.

o.  When an individual feels that they have experienced or witnessed incidents of sexual misconduct, they may contact the Title IX Coordinator or utilize the Title IX procedures detailed in Trinity's Sexual Harassment Policy, to bring concerns forward for the purpose of obtaining a prompt and equitable resolution.

p.  Trinity will respond promptly and equitably to all reports of sexual harassment and will provide reasonably available supportive measures to complainants and respondents, regardless of whether a formal complaint is filed.

q.  All Trinity employees, other than those designated as Confidential Resources in the Sexual Harassment Policy, are required to report any possible violations of the Sexual Harassment Policy or Title IX such as incidents of sexual violence, harassment, or assault, promptly to the Title IX Coordinator or Deputy-Coordinator.  The report must include all known information about the alleged conduct including the identity of the parties, witnesses, dates, times, and locations.

r.  Prompt reporting of sexual harassment or other Trinity policy violations maximizes the ability to effectively investigate of the incident.

s.  Title IX requires the college to investigate all incidents about which it knows or has reason to know to protect the health and safety of the college community.

t.  Pursuant to the Trinity Publications, after receiving a report, Trinity's Title IX Coordinator will:

#

#

    i.   Promptly contact the complainant to identify and provide reasonably available and appropriate support measures; Trinity will maintain the confidentiality of any support measures provided to the extent that doing so would not impair its ability to provide the measures;

   ii.   Assess the nature and circumstances of the report;

  iii.  Address immediate physical safety and emotional well-being needs;

  iv.  Conduct an individualized analysis of safety and risk for the campus community to determine whether a student-respondent's presence at the college poses a threat that warrants that student's removal from campus;

   v.  Notify the complainant of the right to contact law enforcement and seek a civil protection order;

  vi.  Notify the complainant of the right to seek medical treatment;

 vii.  Refer the report to the campus safety department to assess the reported conduct for any Clery Act obligations, including entry in the daily crime log or issuance of a timely warning;

viii.  Provide the complainant with written information about on- and off-campus resources;

  ix.  Provide the complainant with a copy of Trinity's Sexual Harassment Policy and an explanation of their options of how to proceed with their complaint;

   x.  Notify the complainant of the right to be accompanied at any meeting by an adviser of their choice, and that Trinity will provide an advisor to conduct questioning if the complainant has not chosen one;

#

#

xi. Assess the available information for any pattern of conduct by the respondent;

u. Trinity will seek to complete this initial assessment within ten (10) business days and will provide the complainant written notice of the decision on how the college will proceed.

v. In the event that the Title IX Coordinator determines the nature of the complaint falls outside of the Title IX regulations, but the conduct otherwise constitutes prohibited conduct under the Trinity Publications, it will be addressed and will proceed to either a formal or informal resolution process described in the Trinity Publications.

w. In investigating a report, the Title IX office will provide notice to the individuals involved as soon as practicable, obtain an independent investigator, provide ongoing notice about the status of the investigation, and will seek to complete the fact-gathering portion of the investigation within fifty (50) business days.

x. After the investigation, the parties will have ten (10) business days to respond in writing to the evidence prior to the conclusion of the investigation. Based on these written responses, the investigator shall issue a final investigation report.

y. The Title IX Coordinator will then select an administrative hearing panel as promptly as possible.  The panel will seek an appropriate resolution and determine whether disciplinary action is warranted.

32. Students are expected to act in accordance with all federal, state, and local laws and ensure their actions do not endanger, threaten, or disturb themselves or others in the community.

\#

\#

33.     Trinity will hold students responsible for behavior that infringes on the individual rights and autonomy of others.

## VI.     **FACTUAL ALLEGATIONS**

### A.     **Jazmin Johnson and Caila French Join Trinity, Their Dream School.**
### *Ms. Johnson*

34.     Ms. Johnson is from Washington State.

35.     In high school she thrived while competing in diving, cheerleading, and gymnastics. She was an all-area honoree for her high school diving team, which won three State titles and never lost a dual meet in three seasons while she was there.

36.     When it came to choosing her college, Trinity was at the very top of her list.  She was excited about the prospect of attending an elite liberal arts school where she could pursue a variety of academic interests (she had three majors and one minor) and continue her athletic career.

37.     Mentorship was especially important to Ms. Johnson as a first-generation college student who aspired to pursue a graduate degree in the healthcare field.  She believed Trinity could provide her with meaningful mentorship.

38.     Ms. Johnson recalls feeling elated when she received her acceptance letter, particularly because it had a handwritten, personalized note referencing her application essay.  She wanted to be part of a college that viewed each student as more than just a number and would care for her as a human and guide her toward achieving her goals.  This desire was heightened for Ms. Johnson because, just before leaving for college, her mother was diagnosed with cancer and the community, support, and guidance Trinity offered her was especially needed.

\#

\#

39.     In the fall of 2017, Ms. Johnson moved across the country to attend Trinity, pursue her academic dreams, and compete on the swimming and diving team.

### Ms. French

40.     Ms. French moved from Brooklyn, New York to start her college education at Trinity in fall 2017.

41.      In high school, Ms. French participated in several extracurricular activities and excelled in her studies, which included rigorous International Baccalaureate coursework.  She completed an extensive service project in which she organized and executed an event for local youth groups in order to bridge the gap between public and private school children, encourage them to learn about their community, and identify their goals for the future.

42.     Ms. French set her sights on Trinity after participating in an exhilarating hour-long interview with the admissions representative in which she discussed her goals of working toward social justice.  Ms. French was so excited about the possibilities that awaited her at Trinity that she applied to the college early decision, which meant that if Trinity accepted her application, she committed to enrolling.  When she received her acceptance letter, she was delighted that it referenced her in substance as a "social justice powerhouse" and mentioned how excited the college administrators were to welcome her in the fall.

43.     Ms. French was convinced that she could thrive at Trinity and moved to Connecticut to live away from home for the first time.

### B.     A Student Attempts to Rape, and Sexually Assaults, Jazmin Johnson.

44.     Three weeks into her freshman year, on September 23, 2017, a male student sexually assaulted and attempted to rape Ms. Johnson in the stairwell of their dormitory, Jones

15

#

#

Hall.

45.     This male student ("Student-Attacker") was a varsity basketball player at Trinity.

46.     Ms. Johnson immediately reported the assault to two friends from home.

47.     Later that same day, the mother of one of Ms. Johnson's friends contacted Trinity swim coach, Carlos Vega, to notify him.

48.     After learning of the attack, Ms. Johnson's coach reported it to Trinity's Title IX office.

49.     Trinity's then-Title IX Coordinator, Tim Dunn, met with Ms. Johnson on or about September 26, 2017.  At the time she met with him, she was unsure of the path she wished to take regarding her reported assault and asked for the time being that it remain confidential.

50.     Coordinator Dunn represented to Ms. Johnson that he had created a report documenting her complaint to the Title IX office, and that the office would maintain a file for her in the event she decided to pursue the matter further.

**C.     Trinity Staff Mock Ms. Johnson's Emotional Pain.**

51.     Ms. Johnson moved out of her dorm shortly after the attack.  She was so traumatized by the assault and her attacker's continued proximity – as they were both student-athletes – that her teammates expressed concerns to Coach Vega that she might harm herself.

52.     Instead of offering Ms. Johnson accommodations or support, Coach Vega asked Ms. Johnson in advance of a team training trip whether she was "going to become a liability" to the team or "throw herself off a balcony."

53.     This response from Coach Vega – the first Trinity authority figure in whom Ms. Johnson confided about the assault – caused her to feel even more isolated and distraught.

16

#

#

54.     Around the same time, students reported concerns about Ms. Johnson's well-being to their Trinity Area Coordinator, who responded with similar callousness.

55.     The Area Coordinator is a Trinity employee that has oversight over specific residential communities on campus.

56.     The Area Coordinator called Ms. Johnson into a meeting without informing her about the topics to be covered at the meeting.

57.     Instead of ensuring Ms. Johnson got the help that she needed, the Area Coordinator made crude remarks to Ms. Johnson about her thoughts of self-harm.

58.     In this meeting, the Area Coordinator bluntly asked Ms. Johnson "are you trying to kill yourself?" and "show me your arms."

59.     Although the Area Coordinator referred Ms. Johnson to Trinity's counseling center, when Ms. Johnson attempted to make an appointment there, the center informed her that they were not taking any new patients and they could not give her an appointment.

60.     The Area Coordinator never followed up with Ms. Johnson to ensure she was provided proper care or resources to navigate her trauma.

61.     In or around November 2018, Coordinator Dunn entered a no-contact order between Ms. Johnson and the Student-Attacker.

62.     No-contact orders are issued by Trinity and typically remain in place until the Title IX Coordinator deems it no longer necessary.

63.     Although a no-contact order had been put in place, it provided no meaningful protection to Ms. Johnson, as she continued to have to utilize the same dining hall as her attacker as well as the same athletic building as both were student-athletes.

\#

\#

**D.     Later That Same Academic Year, the Same Student-Attacker Rapes Caila French.**

64.     In summer 2018, after her freshman year at Trinity, Ms. French remained on campus.

65.     On June 22, 2018, the same male student who had attacked Ms. Johnson raped Ms. French in her doom room at Vernon Place Hall.

66.     After her assault, Ms. French remained in a state of constant vigilance and fear.

67.     During summer 2018, both Ms. French and her Student-Attacker were living in assigned student-housing in Vernon Place Hall.  Ms. French had a single room which was located directly across from the men's bathroom; her Student-Attacker's room was down the hall on the same floor.

68.     The proximity of her room to the man who had raped her became debilitating to Ms. French.  She self-isolated in her room for the entirety of the summer and rarely emerged from her room except when necessary to go to work or get food.

69.     At the start of Ms. French's sophomore year, she reported her rape to an employee in the Trinity Women & Gender Resource Action Center and several of her professors.

70.     The Women's Center employee reported Ms. French's rape to the Title IX office but did not include Ms. French's name.

71.     Trinity professors are Responsible Employees who are required to report any possible violation of Trinity's Policy on Sexual Harassment (including sexual assault) to the Title IX office. Upon information and belief, *none* of Ms. French's professors who knew about her rape reported it to the Title IX office.

#

#

**E.    Trinity's Poorly-Trained and Frequently-Changing Title IX Coordinators Mishandle the Plaintiffs' Complaints.**

72.    Within the last five years, Trinity has had at least five different Title IX Coordinators.

73.    Some of these Title IX Coordinators worked only part-time in the role.

74.    These Coordinators include Tim Dunn, Venice Ross, Rita Kelley, Amanda Brahm, and now Shannon Lynch.

75.    During Ms. French and Ms. Johnson's time at Trinity, there was a two-year vacancy in the Title IX Coordinator position.

76.    Trinity is required under Title IX to have at least one employee who serves as its Title IX Coordinator at all times.

77.    Instead, Trinity either designated an employee who had other full-time responsibilities with the college to serve as the de facto Title IX Coordinator or appointed interim and part-time Title IX Coordinators during those times when the position was vacant.

78.    Neither Ms. Johnson nor Ms. French were informed when the Title IX Coordinator with whom they had been working departed, nor were they introduced to the new Coordinators who replaced the departing ones.

79.    Trinity's revolving door of Title IX Coordinators directly caused serious harm to Ms. Johnson and Ms. French in a number of ways.

80.    For example, the Title IX office repeatedly failed to maintain records of their complaints.

81.    This failure to maintain records resulted in parts of both Ms. Johnson's and Ms.

#

#

French's files being lost during transitions between Coordinators.

82.     In the fall of 2018, when Ms. Johnson attempted to move forward with a formal investigation process, she was surprised to learn that Coordinator Dunn had left and a new Coordinator, Venice Ross, had replaced him.

83.     In response to Ms. Johnson's request to begin a formal investigation of her complaint, Coordinator Ross responded that she did not know who Ms. Johnson was, had no record that Ms. Johnson had ever made a complaint to the Title IX office, and did not have a file for her.

84.     Coordinator Ross explained that old files – which consisted only of paper copies – were likely housed in former Coordinator Dunn's vacant office.  It is unclear whether and how confidentiality was maintained over those paper files.

85.     Upon information and belief, Coordinator Ross made no effort to retrieve Coordinator Dunn's files or to affirmatively contact student survivors (including Ms. Johnson) to inform them that their Title IX resource had changed.

86.     Similarly, while Ms. French underwent Trinity's investigation into her complaint in March 2020, the Title IX office claimed to have lost Coordinator Ross's file on Ms. French's initial report.

87.     The Title IX office nonetheless plowed ahead, completed its "investigation" without that report, and concluded that Ms. French had not been raped, despite the fact that Coordinator Ross's original notes (now lost) stated clearly that she had.

88.     In late spring 2020, out of the blue, Coordinator Rita Kelley informed the investigator and Ms. French that notes from former Coordinator Ross's meetings with Ms. French had been found.

#

#

89.     Thereafter, Ms. French was then forced to submit to a *second* investigation after the original file was found in order to correct Trinity's mistakes.

90.     Even though Ms. French reported her rape at the outset of her sophomore year, in fall 2018, Trinity did not issue a final investigative report – which concluded that Ms. French had indeed been raped – *until February 2021*.

**F.     Trinity Takes *Years* to Investigate and Issue Findings on Both Ms. French and Ms. Johnson's Complaints; Trinity's Responses to Ms. Johnson and Ms. French's Reports Regarding the Same Student-Attacker Violate Title IX in Multiple Ways.**

*Ms. Johnson*

91.     In the fall semester of 2018, Ms. Johnson notified both Coach Vega and Trinity's interim Athletic Director that she intended to pursue a Title IX investigation against her attacker.

92.     Coach Vega and the Athletic Director contacted the Title IX office and prompted Coordinator Venice Ross to contact Ms. Johnson regarding her desire to pursue a formal investigation.

93.     Thereafter, Coordinator Ross contacted Ms. Johnson.

94.     Ms. Johnson scheduled a meeting with Coordinator Ross on September 18, 2018. In this meeting, Coordinator Ross represented to Ms. Johnson that she would commence an investigation into the complaint and an investigator would contact her.

95.     The investigation began in the first week of October 2018.

96.     Coordinator Ross failed to provide Ms. Johnson with any guidance about the process in advance of her investigation.

97.     Coordinator Ross never advised Ms. Johnson of her rights or options regarding her complaint, including the right to pursue criminal charges.

21

\#

\#

98.     Coordinator Ross told Ms. Johnson that she was permitted to bring one support person to their meetings and told her that this was the only person in whom she could confide about the investigation.   Yet Coordinator Ross failed to explain what role this support person would serve or to provide Ms. Johnson with guidance as to whom she should choose.

99.     Consequently, Ms. Johnson chose her boyfriend, another Trinity student, who had no experience in Title IX matters.

100.     Coordinator Ross ordered Ms. Johnson to refrain from speaking to *anyone* other than her support person about her complaint or investigation, *including their own parents or an attorney*.

101.     Both Title IX regulations and the Clery Act prohibit colleges and universities from requiring a complainant to abide by a non-disclosure agreement, in writing or otherwise.

102.     Further, instead of offering a live hearing, Trinity's Title IX office required Ms. Johnson – and later Ms. French – to undergo a paper investigation process in which they were emailed the preliminary report of the investigation along with statements of the Student-Attacker and instructed to respond to them in writing.   Trinity's Title IX Coordinators failed to provide either of them with any guidance about how to prepare those written responses.   The responses were required to be returned within five days.

103.     This paper investigation proved to be a demoralizing and overwhelming weight on Ms. Johnson, who was simultaneously working to fulfill her duties as a student-athlete and meet all of her academic demands while remaining isolated in the Title IX process.

104.     At one point during the investigation of Ms. Johnson's complaints, Coordinator Ross confronted her and accused her of lying about events which were corroborated by video

#

#

surveillance and key card swipe records.

105.    Coordinator Ross later learned through an independent investigator that Ms. Johnson was correct, and it was *Coordinator Ross* who had read the key card logs incorrectly.

106.    During the investigation, Ms. Johnson began searching for a campus job.

107.    The Athletic Director and her swim coach told her that *she* could not work certain jobs in the athletic department because she may have to interact with her attacker, which would violate the no-contact order.

108.    Neither the Athletic Director nor Ms. Johnson's coach discussed the possibility of exploring ways in which the Student-Attacker could avoid contact with *Ms. Johnson* during her working hours.

109.    Although Ms. Johnson first brought her claim to the Title IX office in October 2017, Trinity did not initiate its investigation until September 2018.

110.    Trinity did not provide Ms. Johnson with a final decision until May of 2019 – *17 months and more than an entire school year after she first reported the assault.*

111.    After these 17 months, Ms. Johnson finally received a decision that her attacker would be suspended from Trinity for a period of one year – less time than it took to even conduct and complete the investigation that determined he attempted to rape her.

### Ms. French

112.    On or about November 1, 2018, when Ms. French first reported to the Trinity Women's Center that she was raped, she was told that they would create a file about her allegations.

113.    Ms. French has never seen such a file.

#

#

114.    Ms. French also reported her rape twice to a professor who, upon the second conversation, notified a Trinity Dean.

115.    In or around April 2019, Ms. French reported her rape to Coordinator Ross.

116.    In their first meeting, Coordinator Ross refused to allow Ms. French to include her friend to support her while she recounted her attack.  Ms. French sobbed throughout this meeting.

117.    In this meeting, Coordinator Ross did not offer Ms. French any resources to process the trauma she had endured.

118.    Coordinator Ross did not encourage or even offer the option to report the rape to the local police.

119.    Coordinator Ross did not explore with Ms. French any accommodation or resources to ensure she had the opportunity to succeed at Trinity while dealing with the aftermath of her assault.

120.    Instead, Coordinator Ross's first response was to express concern for Ms. French's *attacker*, stating that this student-athlete should be given a chance to "know these things are being said about him."

121.    In this first meeting with Coordinator Ross, Ms. French said she feared for her safety on campus, reported she was terrified of the Student-Attacker, and pleaded that the report remain confidential at this initial stage so he would not retaliate against her.

122.    Yet, just days after this meeting, another student-athlete confronted Ms. French on behalf of her attacker, indicating that the Student-Attacker had learned of the report, and asked Ms. French to speak with him about the complaint.

123.     After this encounter, Ms. French pleaded with Coordinator Ross to implement a

#

#

no-contact order between her and her Student-Attacker.

124.    Coordinator Ross replied that she would not be able to do anything about the situation until Monday because Ms. French reported the attacker's veiled threat on a weekend.

125.    Terrified for her safety, Ms. French was forced to leave campus for the weekend.

126.    Ms. French first brought her complaint to mandated reporters in fall 2018 and to the Title IX office in spring 2019.

127.    Trinity did not initiate an investigation into her reported rape until spring 2020 – a delay of over a year.

128.    By spring 2020, the end of Ms. French's junior year, Trinity had yet another interim Title IX Coordinator, Rita Kelley.

129.    Coordinator Kelley was Trinity's third Title IX Coordinator in three years and only worked in the role part-time.

130.    After the Student-Attacker's one-year suspension, which stemmed from Ms. Johnson's investigation, *Trinity invited the Student-Attacker to return to school and assigned him to a dorm one door down from Ms. French and located in Ms. Johnson's territory as an RA.*

131.    Coordinator Kelley informed Ms. French that the Student-Attacker would be returning to Trinity for his senior year and that, if she wanted to prevent his return, she needed to participate in a formal investigation.

132.    Although the Student-Attacker's suspension stemmed from Ms. Johnson's investigation, no one from Trinity informed Ms. Johnson that her attacker would be returning to school.

133.    Indeed, Ms. Johnson only found out about his imminent return in March 2020 when

#

#

*Ms. French* found her contact information and informed her of this news.

134.    Upon information and belief, the Student-Attacker, of his own volition, ultimately did not matriculate in the fall 2020 – spring 2021 school year because he transferred to another college.

135.    From the time they discovered the Student-Attacker would be returning to campus until many months later when they finally learned he would not, Ms. French and Ms. Johnson remained in a constant state of fear and panic.

### Ms. French's First Investigation

136.    Frightened by Coordinator Kelley's notice that the Student-Attacker would be returning to school, Ms. French participated in a formal investigation into her reported rape.

137.    This investigation commenced in or around April 2020 and persisted well into the summer.

138.    Upon commencing an investigation into Ms. French's reported rape, Coordinator Kelley, like Coordinator Ross, failed to provide Ms. French with meaningful guidance about the process in advance of her investigation.

139.    Coordinator Kelley told Ms. French that she was permitted to choose one support person for the investigation and that this person would be the sole individual in whom she could confide about the investigation and the sole individual permitted to accompany her to investigation meetings.

140.    Throughout this first investigation, Trinity's Title IX office subjected Ms. French to a paper investigation process in which she was emailed the preliminary report of the investigation along with statements from her Student-Attacker and instructed to respond to them

#

#

in writing within five days

141.    This paper investigation process and the tight timeline in which it had to be completed intimidated Ms. French and caused her great anxiety.

142.    During the course of this first investigation, the independent investigator requested to review notes taken by former-Coordinator Ross during her meetings with Ms. French in 2019.

143.    Coordinator Kelley informed the independent investigator that those notes were lost.

144.    The investigator proceeded in drafting a report which incorrectly concluded that Ms. French had not been raped by her Student-Attacker.

145.    This finding was devastating to Ms. French, particularly because she made it clear in the investigation that she had been raped, and the Title IX office's file (now lost) stated clearly that she had been raped.

### Ms. French's Second Investigation

146.    Out of the blue, Coordinator Kelley informed the investigator and Ms. French that notes from former Coordinator Ross' meetings with Ms. French had inexplicably been found.

147.    Thereafter, Ms. French was forced to submit to a *second* investigation after the original file was found in order to correct Trinity's mistakes.

148.    This investigation commenced in the fall of 2020.

149.    Once more, Ms. French was subjected to an isolating investigation just like the one she endured the prior academic year.

150.    Ms. French was completely debilitated during her senior year, taking many "incompletes" in her coursework and nearly not graduating on time, because she was subjected to

27

#

#

this second investigation which lasted the duration of her senior year.

151.    In all, it took 29 months after Trinity was put on notice that Ms. French had been raped for it to issue a final investigative report and discipline the Student-Attacker.  That report concluded that she had indeed been raped and, at long last, expelled the Student-Attacker.

152.    Ms. French did not receive a final decision on her complaint until April 2021.  She graduated the next month.

**G.     Trinity's Title IX Office Is Notorious for Silencing Survivors and Botching Investigations.**

153.    During Ms. French's and Ms. Johnson's time at Trinity, an Instagram page called TrinSurvivors surfaced to address what its creators and contributors perceived as rampant sexual violence left unaddressed by Trinity and its Title IX office.

154.    Between June 2020 and June 2021 alone, TrinSurvivors received over 300 submissions regarding sexual assault on Trinity's campus.

155.    The posts on the TrinSurvivors site demonstrate why students have lost faith in Trinity's ability or willingness to protect them and why students were so reluctant to report incidents of sexual assault and violence to the Trinity administration.

156.    These TrinSurvivors posts are illustrative of the environment that Trinity's Title IX Coordinators created, which Ms. French, Ms. Johnson, and countless others endured:

a)  "The Title IX Coordinator then (sic) I was a freshman, Timothy Dunn, told my friend who had also been raped [in the same dorm] that they shouldn't go through with an investigation because 'they were nice guys.' I did not report my rape to him because I did not feel safe with him. I did not report my rape to him because he had made it clear that he did not support victims when it conflicted with his personal relationships with the fraternities."

#

#

b) "When I reported these incidents to Trinity, they told me not to contact the Hartford Police. Instead, it took an entire semester of me defending myself in endless emails for the student in question to even be at risk of suspension/punishment. He didn't leave campus when he was told to. I thought he was gone but I ran into him at a party. No one had made sure he actually left campus."

c) "I was spending my summer on campus when I felt extremely unsafe because of this boy who apparently was under Dean []'s "radar" – whatever that might be. This student, who was living in a room close to mine, was someone who had been pushy with me and several other girls in the past, not accepting a no for an answer. Over that summer, I had to deal with him [stalking me in my dorm and sexually harassing me]. I didn't want to report him at first because I had my fair amount of experience trying to report similar experiences to … [T]itle IX only to be blamed. But then, once I finally reported him, little to nothing was done. I was asked if I wanted to change my room and to get a restraining order, which would mostly just ensure he would not be in the same class as me in the future, because 'our campus is too small' to guarantee anything else. I was advised to just not open the door and avoid places where he would probably be at, because Dean [] was already dealing with other sexual harassment cases involving this boy."

d) "In 2015-2016 I was harassed on … the [s]treet at night while walking to my car after a night class. A car full of guys [sexually harassed and verbally abused me and threatened my life]. They followed me to my car before driving away. I reported this to campus safety who didn't call the police, but I DID. Campus safety never even sent out an email to alert people to the incident."

e) "As a freshman [an athlete touched me in a sexual manner without my consent] . . . at a college-sponsored party on school property. . . The following week I reported the incident to the Dean of Students and Women's Center. I was told repeatedly of the negative impact this could have on him and asked to reconsider my choice to report the incident."

157.   To further demonstrate Trinity's knowledge of a historic hostile academic environment based on sex, the following is an excerpt from a book published in 2021, *In the Shadow of the Ivory Tower*, authored by Dr. Davarian L. Baldwin, a Trinity College faculty member since 2009:

#

#

> Pushing an image of campus innocence left many students vulnerable, including women sexually assaulted on campus…. … as one female student said, 'I am more worried about the guys sitting in class next to me than a few kids on bikes.' Admissions policies reinforced this student's fears. A senior admissions officer acknowledged that in order to capture more full payers, Trinity lowers its academic standards for acceptance. This officer told [] that Trinity even welcomed rich students with poor disciplinary records, including those with sexual-assault and rape charges. Another administrator reluctantly confirmed, 'Trinity really prized tuition-paying students.' *Id.* at p. 78.

**H.**   **Ms. Johnson and Ms. French were directly harmed in numerous ways by Trinity's actions, inactions, and failures in handling their sexual assault complaints.**

158.   The Title IX office knew that both Ms. French and Ms. Johnson had pending complaints against the same Student-Attacker at the same time.

159.   Upon information and belief, Trinity was aware that this Student-Attacker had sexually harassed and assaulted other women on campus.

160.   Ms. French reported to Coordinator Ross that this Student-Attacker had shown a pattern of sexually violent behavior towards other women since his arrival on campus.  Ms. French and Ms. Johnson reported to Coordinator Ross that other Trinity students, including one of Ms. Johnson's teammates, and one of Ms. French's acquaintances, had endured sexual harassment and assault at the hands of this Student-Attacker.

161.   Instead of pursuing any investigation based on these reports, Coordinator Ross placed the burden on Ms. French and Ms. Johnson to convince the other students to come in and speak with her about this attacker.

162.   Both Ms. French and Ms. Johnson were told by Coordinator Ross, and later Coordinator Kelley, that they were not the only students who had filed complaints against their

#

#

Student-Attacker, but "anonymous reports don't matter" and the Title IX office "couldn't do anything with them."

163.    Even though the Trinity administration knew the Student-Attacker was a danger to women on campus – its Title IX office failed to provide the prompt investigation and equitable discipline required by Title IX.

164.    The assault and rape of Ms. Johnson and Ms. French respectively by the same student who was a known sexual predator, along with the administration's failure to timely investigate their claims and take corrective action and provide them with resources to cope with their trauma created in both Ms. French and Ms. Johnson such fear for their physical safety that they were unable to fully participate in normal college activities, such as attending classes or Student Union–sanctioned events.

165.    Both Ms. Johnson and Ms. French were robbed of anything resembling a normal college experience.

***Ms. French***

166.    Ms. French was unable to attend many courses after her assault and during the time in which she underwent two Title IX investigations, and she had to seek extensions on several projects and final examinations.

167.    Ms. French told Coordinator Kelley that she was experiencing great stress and was concerned about its impact on her academic performance as the Title IX investigation intensified and doubled in scope.

#

#

168.     During Ms. French's prolonged Title IX investigations, she experienced extreme anxiety accompanied by nausea, shaking, insomnia, and other physical manifestations of her trauma.

169.     During her sophomore year after reporting her assault, Ms. French routinely slept off-campus, stayed with friends and at times, even paid to sleep at hotels to avoid being in close proximity to her attacker who continued to live the same dorm as she did.

170.     Ms. French feared encountering her attacker on campus and asked her friends to let her know where her attacker was on campus so that she could avoid the area.

171.     She was utterly terrified by any knocks on her doors so much so that her friends would have to notify her in advance if they planned to visit because she became paralyzed by fear if anyone showed up to her room unannounced.

172.     Ms. French also routinely skipped meals and stayed isolated in her room out of fear that she may run into her attacker on campus.

173.     Ms. French treated with multiple medications in an effort to manage her symptoms stemming from Trinity's mismanagement of her sexual assault investigation.

174.     As a result of the attack and to an even greater extent, the abusive and careless manner in which Trinity mismanaged her complaint, Ms. French continues to suffer from PTSD, depression, anxiety, night terrors, and disordered eating, and will require continued treatment with medication and a psychiatrist.

### Ms. Johnson

175.     In or around spring 2019, Ms. Johnson requested to be taken off the meal plan so that she would not have to continue to see her attacker.  The Title IX Coordinator did not grant the

#

#

request but instead told Ms. Johnson that no one had ever made such a request and she did not know if it would be permitted.  Ms. Johnson followed up multiple times but the request was never approved that year.  It was not until her senior year that Ms. Johnson was finally allowed to come off the meal plan.

176.    This denial by Trinity, caused Ms. Johnson to incur financial loss by paying for a meal plan but also purchasing food off campus to avoid seeing her Student-Attacker.  Ms. Johnson was also forced to seek treatment outside of Trinity because of Trinity's refusal to schedule her for treatment by Trinity's mental health facility.

177.    At the recommendation of her psychiatrist, Ms. Johnson acquired an emotional support animal to assist in the treatment of her PTSD and other diagnoses which stem from Trinity's mismanaging of her assault investigation.

178.    Although Ms. Johnson provided Coordinator Ross with a letter from her psychiatrist attesting to the need for Johnson to bring her support animal to school to ameliorate her compromised mental health, Trinity refused to allow her to do so.

179.    After multiple requests and justifications were submitted for the support animal, Ms. Johnson was finally permitted to bring her support animal to campus.  However, the repeated unjustified denials and delay further exacerbated Ms. Johnson's trauma.

180.    Ms. Johnson treated with multiple medications in an effort to manage her symptoms stemming from Trinity's mismanagement of her sexual assault investigation.

181.    She also was forced to forgo on-campus job opportunities, on which she depended financially, based on Trinity's mismanagement of her complaint.

#

#

182.    Ms. Johnson continues to suffer from severe insomnia, anxiety, and depression and will require continued treatment with medication and a psychiatrist.

183.    As a result of the attack and to an even greater extent, the abusive and careless manner in which Trinity investigated her complaint, Ms. Johnson has suffered and continues to suffer from extreme anxiety, shaking, severe insomnia, night terrors, depression, panic attacks, episodes of self-harm, suicidal ideations, and other physical manifestations of her trauma

### Ms. French and Ms. Johnson

184.    The impact of Trinity's botched and prolonged investigations on Ms. French's and Ms. Johnson's lives has been all-encompassing.

185.    They have both have avoided countless groups, activities, social events, and educational opportunities as a result of the trauma they suffered by Trinity's mishandling their allegations of sexual assault.

186.    Both Ms. Johnson and Ms. French incurred significant expenses to attend Trinity, including paying out of pocket and taking out loans for such costs and fees for tuition, Trinity's general fee, a student activity fee, room costs, meal plan costs, and other costs related to living expenses.

187.    Both Ms. Johnson and Ms. French have incurred expenses relating to their treatment for conditions attributable to Trinity's failures in handling their complaints of sexual assault.

\#

\#

## VII.   LEGAL CLAIMS

**FIRST CAUSE OF ACTION:**
**SEX DISCRIMINATION IN VIOLATION OF TITLE IX**
**OF THE EDUCATIONAL AMENDMENTS OF 1972, 20 U.S.C. § 1681,**
**BY JAZMIN JOHNSON.**

188.   Ms. Johnson incorporates by reference all preceding allegations in this Complaint.

189.   At all times relevant to this action, Ms. Johnson was enrolled at Trinity College as an undergraduate student.

190.   Upon information and belief, at all times relevant to this action, Trinity has received, and continues to receive, federal financial assistance.

191.   Title IX and its implementing regulations, 34 C.F.R. part 106, prohibit sex-based discrimination in educational settings.

192.   Sexual harassment, including student-on-student sexual harassment, is a form of discrimination for Title IX purposes.

193.   Title IX's implementing regulations define "sexual harassment" to include conduct on the basis of sex that meets the definition of, among other things, sexual assault.  34 C.F.R. §106.30(a)(3).

194.   Consistent with these regulations, the Trinity College Policy on Sexual Harassment explicitly defines sexual harassment to include sexual assault.  Trinity has an additional relevant policy titled Trinity College Policy on Sexual Misconduct.

195.   Trinity had actual notice that Ms. Johnson experienced sexual assault on Trinity's campus while she was a student at Trinity.

#

#

196.     Trinity had an obligation to address reports that Ms. Johnson was sexually assaulted at Trinity, because such violence is a form of prohibited sex-based discrimination or harassment under Title IX.

197.     The discrimination, consisting of Ms. Johnson's physical assault and emotional abuse on Trinity's campus for years, was so severe, pervasive, and/or objectively offensive that it deprived her of access to educational opportunities or benefits at Trinity.

198.     Trinity was obligated under Title IX to promptly respond to reports that Ms. Johnson was a victim of sexual assault.

199.     As a result of Trinity's treatment of Ms. Johnson in the wake of her report of sexual assault, Ms. Johnson suffered injuries, damages, and losses, including emotional distress, fear, anxiety, and trauma; physical and mental pain and suffering; and pecuniary losses, including cost of tuition, cost of room and board, moving costs, medical expenses, and psychiatric expenses.

200.     Accordingly, Ms. Johnson is entitled to compensatory damages, as well as reasonable attorneys' fees and costs.

**SECOND CAUSE OF ACTION:**
**DELIBERATE INDIFFERENCE IN VIOLATION OF TITILE IX OF THE**
**EDUCATIONAL AMENDMENTS OF 1972, 20 U.S.C. § 1681**
**AS TO JAZMIN JOHNSON.**

201.     Ms. Johnson repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

202.     At all relevant times, the Student-Attacker was a Trinity student subject to Trinity's control, and his assault of Ms. Johnson occurred on Trinity's campus.

#

#

203.    Despite its obligation to respond appropriately to reports that Ms. Johnson had been sexually assaulted on campus, Trinity acted with deliberate indifference to the reports of sexual assault.

204.    As a result of Trinity's deliberate indifference to reports that Ms. Johnson was a victim of sexual assault on Trinity's campus, Ms. Johnson suffered a hostile educational environment.

205.    Trinity had actual knowledge of the harassment sustained by Ms. Johnson and others.

206.    Trinity's response (and lack of response) to the harassment sustained by Ms. Johnson was deliberately indifferent, insofar as the response or lack thereof was clearly unreasonable in light of the known circumstances.

207.    Had Trinity not been deliberately indifferent to multiple reports of Ms. Johnson's sexual assault and additional reports of sexual assault by the same Student-Attacker, and instead complied with Title IX and Trinity's own Title IX policies by properly responding to reports of sexual assault and taking appropriate steps to protect Ms. Johnson's safety, her deprivation of access to educational opportunities or benefits could have been prevented.

208.    Trinity was also deliberately indifferent in its treatment of Ms. Johnson when it failed to inform her that her Student-Attacker would be returning to campus, and in assigning the Student-Attacker to reside in Ms. Johnson's territory as an RA despite a no-contact order remaining in place.

209.    Because of Trinity's deliberate indifference, Ms. Johnson suffered injuries, damages, and losses, including emotional distress, fear, anxiety, and trauma; physical and mental

#

#

pain and suffering; and pecuniary losses, including cost of tuition, cost of room and board, moving costs, medical expenses, and psychiatric expenses.

210.    Accordingly, Ms. Johnson is entitled to compensatory damages, as well as reasonable attorneys' fees and costs.

### THIRD CAUSE OF ACTION:
### SEX DISCRIMINATION IN VIOLATION OF TITLE IX
### OF THE EDUCATIONAL AMENDMENTS OF 1972, 20 U.S.C. § 1681,
### BY CAILA FRENCH.

211.    Ms. French incorporates by reference all preceding allegations in this Complaint.

212.    At all times relevant to this action, Ms. French was enrolled at Trinity College as an undergraduate student.

213.    Upon information and belief, at all times relevant to this action, Trinity has received, and continues to receive, federal financial assistance.

214.    Title IX and its implementing regulations, 34 C.F.R. part 106, prohibit sex-based discrimination in educational settings.

215.    Sexual harassment, including student-on-student sexual harassment, is a form of discrimination for Title IX purposes.

216.    Title IX's implementing regulations define "sexual harassment" to include conduct on the basis of sex that meets the definition of, among other things, sexual assault.  34 C.F.R. §106.30(a)(3).

217.    Consistent with these regulations, the Trinity College Policy on Sexual Harassment explicitly defines sexual harassment to include sexual assault. Trinity has an additional relevant policy titled Trinity College Policy on Sexual Misconduct.

\#

\#

218.    Trinity had actual notice that Ms. French experienced sexual assault on Trinity campus while she was a student at Trinity.

219.    Trinity had an obligation to address reports that Ms. French was sexually assaulted at Trinity, because such violence is a form of prohibited sex-based discrimination or harassment under Title IX.

220.    The discrimination, consisting of Ms. French's physical assault and emotional abuse on Trinity's campus for years, was so severe, pervasive, and objectively offensive that it deprived her of access to educational opportunities or benefits at Trinity.

221.    Trinity was obligated under Title IX to promptly respond to reports that Ms. French was a victim of sexual assault.

222.    As a result of Trinity's treatment of Ms. French in the wake of her report of sexual assault, Ms. French suffered injuries, damages, and losses, including emotional distress, fear, anxiety, and trauma; physical and mental pain and suffering; and pecuniary losses, including cost of tuition, cost of room and board, moving costs, medical expenses, and psychiatric expenses.

223.    Accordingly, Ms. French is entitled to compensatory damages, as well as reasonable attorneys' fees and costs

### FOURTH CAUSE OF ACTION:
### DELIBERATE INDIFFERENCE IN VIOLATION OF TITILE IX OF THE
### EDUCATIONAL AMENDMENTS OF 1972, 20 U.S.C. § 1681
### AS TO CAILA FRENCH.

224.    Ms. French repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

225.    At all relevant times, the Student-Attacker was a Trinity student subject to Trinity's control, and his assault of Ms. French occurred on Trinity's campus.

#

#

226.     Despite its obligation to respond appropriately to reports that Ms. French had been sexually assaulted on campus, Trinity acted with deliberate indifference to the reports of sexual assault.

227.     As a result of Trinity's deliberate indifference to reports that Ms. French was a victim of sexual assault on Trinity's campus, Ms. French suffered a hostile educational environment.

228.     Trinity had actual knowledge of the harassment sustained by Ms. French and others.

229.     Had Trinity not been deliberately indifferent to multiple reports of sexual assault by the same Student-Attacker, Ms. French's assault and her ensuing trauma could have been prevented as could her resulting deprivation of access to educational opportunities or benefits.

230.     Had Trinity not been deliberately indifferent to Ms. French's reports of her assault and complied with Title IX and Trinity's own Title IX policies by properly responding to reports of sexual assault and taking appropriate steps to protect students' safety, Ms. French's ensuing trauma could have been prevented, as could her resultant deprivation of access to educational opportunities or benefits.

231.     Trinity's response to the harassment sustained by Ms. French and its lack of response was deliberately indifferent, insofar as the response or lack thereof was clearly unreasonable in light of the known circumstances.

232.     Because of Trinity's deliberate indifference, Ms. French suffered injuries, damages, and losses, including emotional distress, fear, anxiety, and trauma; physical and mental pain and suffering; and pecuniary losses, including cost of tuition, cost of room and board, moving costs, medical expenses, and psychiatric expenses.

\#

\#

233.    Accordingly, Ms. French is entitled to compensatory damages, as well as reasonable attorneys' fees, costs, and disbursements.

## FIFTH CAUSE OF ACTION:
## NEGLIGENCE AGAINST TRINITY COLLEGE,
## AS TO JAZMIN JOHNSON.

234.    Ms. Johnson repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

235.    At all times relevant to this action, Ms. Johnson was enrolled at Trinity College as an undergraduate student.

236.    Trinity affirmatively assumed responsibility for Ms. Johnson's safety on campus.

237.    Trinity further had a duty to respond appropriately to sexual violence complaints pursuant to Title IX and Trinity's own policies and procedures on sexual harassment and sexual misconduct.

238.    Ms. Johnson reasonably relied on Trinity to ensure her reports of sexual assault were promptly investigated and adjudicated.

239.    Trinity breached its duty to Ms. Johnson when it failed to ensure her safety and follow its own no-contact order by neglecting to inform her that her attacker would be returning to school for the 2020 - 2021 academic year.

240.    Trinity further breached its duty by assigning Ms. Johnson's Student-Attacker to live in a dorm room located in Ms. Johnson's territory as an RA the prospect of which caused Ms. Johnson great emotional trauma.

241.    Ms. Johnson's damages were the foreseeable consequences of Trinity's breach of its duty to her.

#

#

242.    Trinity's failure to exercise reasonable care for Ms. Johnson as detailed above gives rise to liability under Connecticut law.

243.    Because of Trinity's breach of the duty it owed to Ms. Johnson, she has suffered injuries, damages, and losses, including emotional distress, fear, anxiety, and trauma; physical and mental pain and suffering; and pecuniary losses.

**SIXTH CAUSE OF ACTION:**
**NEGLIGENCE AGAINST TRINITY COLLEGE,**
**AS TO CAILA FRENCH.**

244.    Ms. French repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

245.    At all times relevant to this action, Ms. French was enrolled at Trinity College as an undergraduate student.

246.    Trinity affirmatively assumed responsibility for Ms. French's safety on campus, including in her Trinity dorm room.

247.    Ms. French reasonably relied on Trinity to secure her dorm building and room and ensure her safety inside of the dorm.

248.    Trinity had a duty to protect Ms. French from her attacker because his prior sexual harassment and assault of other young women at Trinity, including Ms. Johnson, made it reasonably foreseeable to Trinity that he would sexually harass or assault Ms. French.

249.    Trinity's failure to take reasonable steps to protect Ms. French from her attacker, a student with a known history of sexually harassing and assaulting other women students, including Ms. Johnson, was a substantial factor in causing Ms. French's assault.

\#

\#

250.     Trinity had a duty to respond appropriately to sexual violence complaints pursuant to Title IX and Trinity's own policies and procedures on sexual harassment and sexual misconduct.

251.     Trinity had a duty to promptly investigate reports of sexual assault, such as the one lodged by Ms. Johnson.

252.     Ms. French reasonably relied on Trinity to ensure reports of sexual assault were promptly investigated and adjudicated.

253.     Trinity breached its duty to Ms. French by failing to promptly investigate Ms. Johnson's report of sexual assault by the same Student-Attacker and impose appropriate discipline on that person.

254.     Trinity breached its duty to Ms. French when multiple mandated reporters failed to properly report her rape to the Title IX office.

255.     Trinity breached its duty to Ms. French by subjecting her to multiple investigations into her rape by a Trinity student-athlete solely due to its negligence in misplacing critical documents and concluding its initial investigation without considering those documents.

256.     Trinity breached its duty to Ms. French by delaying for years to properly and swiftly investigate and resolve her reported rape in a way that ensured her safety on campus.

257.     Trinity breached its duty to Ms. French by failing to impose appropriate and meaningful discipline against her rapist by instead delaying so long that the Student-Attacker voluntarily enrolled in another university such that any discipline was rendered meaningless.

258.     Ms. French's damages were the foreseeable consequences of Trinity's breach of its duty to her.

\#

\#

259.    Trinity's failure to exercise reasonable care for Ms. French at any point after her rape until she graduated gives rise to liability under Connecticut law.

260.    Because of Trinity's breach of the duty it owed to Ms. French, she suffered injuries, damages, and losses, including emotional distress, fear, anxiety, and trauma; physical and mental pain and suffering; and pecuniary losses, including loss of tuition.

**SEVENTH CAUSE OF ACTION:**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**AGAINST TRINITY COLLEGE,**
**AS TO JAZMIN JOHNSON.**

261.    Ms. Johnson repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

262.    Trinity's conduct in failing to notify Ms. Johnson that her Student-Attacker was scheduled to return to school for the 2020 - 2021 academic year, failing to enforce its own no-contact order in place, and assigning Ms. Johnson's Student-Attacker to live in a dorm room located in her territory as an RA all involved an unreasonable risk of causing emotional distress to Ms. Johnson.

263.    Trinity knew, or should have known, that these actions, and the actions and conduct of its Administrators and Title IX Coordinators, involved an unreasonable risk of causing emotional distress to Ms. Johnson.

264.    Trinity's conduct was arbitrary and capricious with no discernible rational basis.

265.    Trinity's conduct, particularly that of its Title IX Coordinators, caused Ms. Johnson's distress.

266.    Ms. Johnson's emotional distress resulting from these actions was a foreseeable consequence of Trinity's negligent conduct.

#

#

267.    The emotional distress was severe enough that it did result in illness and bodily

harm.

## EIGHTH CAUSE OF ACTION:
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## AGAINST TRINITY COLLEGE,
## AS TO CAILA FRENCH.

268.    Ms. French repeats and realleges the above paragraphs as if the same were fully set

forth at length herein.

269.    Trinity's conduct in the following created an unreasonable risk of causing Ms.

French emotional distress in that it:

a.   failed to take reasonable steps to protect Ms. French from her attacker, a
student with a known history of sexually harassing and assaulting other
women students;

b.   failed to adequately report her rape to the Title IX office via its mandatory
reporters;

c.   failed to respond appropriately to sexual violence complaints pursuant to
Title IX and follow Trinity's own policies and procedures on sexual
harassment and sexual misconduct;

d.   failed to promptly and competently investigate Ms. French's reported rape
and take steps to ensure her safety on campus;

e.   failed to enforce its own no-contact order in place and assigned Ms.
French's Student-Attacker to live in a dorm room immediately adjacent to
her own room;

f.   failed to properly maintain critical documents which resulted in subjecting
her to multiple investigations into her rape

g.   failed to impose prompt and meaningful discipline against her rapist;

45

\#

\#

    h.  failed to exercise reasonable care for Ms. French and notify her of appropriate resources to support her.

270.    Trinity knew, or should have known, that these actions, and the actions and conduct of its Administrators and Title IX Coordinators, involved an unreasonable risk of causing emotional distress to Ms. French.

271.    Trinity's conduct was arbitrary and capricious with no discernible rational basis.

272.    Trinity's conduct, particularly that of its faculty, mandated reporters, administrators, and Title IX Coordinators, was the cause of Ms. French's distress.

273.    Ms. French's emotional distress resulting from these actions was a foreseeable consequence of Trinity's negligent conduct.

274.    The emotional distress was severe enough that it did result in illness and bodily harm.


### NINTH CAUSE OF ACTION:
### RECKLESS AND WANTON MISCONDUCT
### AS TO MS. FRENCH AND MS. JOHNSON

275.    Ms. Johnson and Ms. French repeat and reallege the above paragraphs as if the same were fully set forth at length herein.

276.    Trinity engaged in reckless and wanton misconduct during its investigations into Ms. Johnson's and Ms. French's reports of sexual assault by their Student-Attacker, during the two formal investigations into the Plaintiff's complaints, and in determining the discipline for this Student-Attacker in violation of its own policies and procedures.

#

#

277.    Trinity acted with reckless indifference to the Plaintiff's rights in a number of ways.

278.    This Student-Attacker's pattern of behavior and history of sexual harassment and assault of other students was *well* known to Trinity personnel during his time as a student-athlete.

279.    Instead of pursuing any investigation or diligence based on multiple reports relating to this student, Trinity did not promptly investigate serious allegations lodged with its Title IX office and placed the burden on its students to advance their investigation.

280.    Had Trinity not been deliberately indifferent to multiple reports of sexual assault by the same Student-Attacker, including that of Ms. Johnson, and instead complied with Title IX and Trinity's own Title IX policies by properly responding to reports of sexual assault and taking appropriate steps to protect students' safety, Ms. French's assault could have been stopped, the trauma she endured and continues to endure could have been spared, and her deprivation of access to educational opportunities or benefits could have been prevented.

281.    Although Trinity was first notified of Ms. Johnson's assault in September 2017, and she brought her claim to the Title IX office in October 2017, Trinity did not initiate its investigation until October 2018, and it did not provide her with a final decision until May of 2019 – *17 months* and an entire school year after she first reported the assault. This inexcusable delay in investigating Ms. Johnson's claims demonstrate a reckless indifference to her rights.

282.    After those 17 months, Ms. Johnson finally received a decision that her attacker would be suspended from Trinity for a period of one year – less time that it took to even conduct and complete the investigation that determined he assaulted her.  This delayed and discipline shows a reckless indifference for Ms. Johnson's rights.

#

#

283.    Similarly, Ms. French first brought her complaint to mandated reporters in fall 2018 and then to the Title IX office in spring 2019.  Yet, Trinity did not initiate an investigation into her reported rape until spring 2020 – a delay of over one year.  Ms. French did not receive a final decision on her complaint until April 2021 – *29 months* after her initial report and after she had essentially concluded her senior year at the college.

284.    The daunting and glacial investigation of Ms. French's claims demonstrates a reckless indifference to her rights.

285.    Trinity's "action" against the Student-Attacker in the form of a note on his transcript after all students had already concluded their senior year at Trinity and *long* after this Student-Attacker voluntarily transferred to pursue his athletic career at a different institution, demonstrates its utterly toothless discipline and was a reckless indifference to Ms. French's rights.

286.    Trinity's *affirmative direction* to both Ms. Johnson and Ms. French that they were to isolate themselves and not discuss their claims or investigation with anyone outside of their sole designated support person, which excluded even their parents, lawyers, or law enforcement, are blatant and reckless indifference to their rights.

287.    Trinity's failure to advise Ms. Johnson or Ms. French on how to successfully navigate the Title IX process, including its failure to explain what role their designated support person would serve, providing any guidance as to whom they should choose, or what their paper submissions should include in the written investigation statements demonstrates a reckless indifference to their rights.

#

#

288.    Trinity's failure to offer meaningful and available support resources, and Trinity's failure to follow through and ensure Ms. Johnson and Ms. French received the proper treatment following their sexual assaults shows a reckless indifference to their rights.

289.    Trinity's numerous instances of reckless indifference to Ms. Johnson and Ms. French's rights while they were students in Trinity's care led to substantial injury for both Plaintiffs.

290.    These include but are not limited to those outlined in Paragraphs 146 to 175 of this Complaint.

291.    Trinity's actions in mis-managing Ms. Johnson's and Ms. French's reports of sexual assault were not mere mistakes; the revolving door of Title IX Coordinators and two-year vacancy in the position, the loss or destruction of student's Title IX files, the victim blaming and failure to get students help, the unwillingness to assist Ms. French on the weekend when her physical safety was in jeopardy or promptly respond to Ms. Johnson's request for therapy and her concerns about obtaining the medication she needed and the support dog prescribed by her medical provider, among other examples, demonstrate *extreme* disregard for the safety and rights of Ms. Johnson and Ms. French – students that Trinity is supposed to protect.

292.    The ways in which Trinity repeatedly and intentionally violated its own policies and procedures, prolonged the suffering of both Ms. Johnson and Ms. French, completely devasted them.

293.    Trinity knew or should have known its actions as alleged violated internal policies and procedures, and duties owed to students.

#

#

294.    Trinity's failure to alleviate a known danger to the female students at Trinity and a Student-Attacker with a clear propensity to hurt others at Trinity by allowing this Student-Attacker to remain on campus and at large for so long and by inviting him to return to campus (and to do so next to Ms. French and under Ms. Johnson's RA supervision) is highly unreasonable and presents the high degree of danger required to show reckless and wanton misconduct.

### TENTH CAUSE OF ACTION:
### BREACH OF CONTRACT AS TO JAZMIN JOHNSON.

295.    Ms. Johnson repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

296.    Ms. Johnson applied to an enrolled as a student at Trinity and paid required tuition, fees, and expenses.

297.    Ms. Johnson's application to and enrollment as a student at Trinity was done in reliance on Trinity's representations, and with the reasonable expectation, that, Trinity would implement and enforce the provisions and policies set forth in its official publications, including its Student Handbook and its Sexual Harassment Policy, as well as all supporting and explanatory documents produced, published, and/or disseminated by Trinity.

298.    An express contract or, alternatively, a contract implied in law or in fact was formed between Ms. Johnson and Trinity.

299.    Ms. Johnson has performed all conditions required of her under the terms of the Trinity Publications.

300.    Trinity breached its contract with Ms. Johnson in numerous ways, including but not limited to one or more of the following ways:

#

\#

    a.   Trinity failed to complete its investigation in the timeline provided under its policies.

    b.   Trinity failed to investigate Ms. Johnson's reports of potential violations of Trinity Publications, including, but not limited to, potential sexual misconduct, harassment, and sexual assault.

    c.   Trinity conducted an inadequate and incomplete investigation of the charges against the Student-Attacker.

    d.   Trinity failed to comply with Title IX, as set forth above.

    e.   Trinity failed to provide an environment free from discrimination and harassment and its promise to address sexual misconduct.

    f.   Trinity failed to respond promptly and thoroughly to complaints, taking years to get to a final investigative report and disciplinary action.

    g.   Trinity denied Ms. Johnson equal access to employment opportunities on campus.

    h.   Trinity denied Ms. Johnson equal access to and participation in educational opportunities and benefits.

301.    As a result of Trinity's breach of the Trinity Publications, including but not limited to as set forth above, Ms. Johnson has sustained substantial monetary losses and other significant damages, including severe mental distress and anguish, loss of academic achievement, and loss of employment opportunities.

**ELEVENTH CAUSE OF ACTION:**
**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**
**AS TO JAZMIN JOHNSON.**

302.    Ms. Johnson repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

\#

\#

303.    The Trinity Publications, including the Sexual Harassment Policy and the Student Handbook, each contained an implied covenant of good faith and fair dealing pursuant to which Trinity was obligated to deal with Ms. Johnson in a fair, reasonable, and equitable matter to ensure that she received all benefits to which she was entitled under the Trinity Publications.

304.    By engaging in the foregoing conduct, Trinity callously, willfully, and deliberately disregarded Ms. Johnson's rights under the Trinity Publications.

305.    Trinity's unreasonable and intentional conduct in failing to comply with its contractual obligations was in reckless, wanton, deliberate, malicious and callous disregard of Ms. Johnson's rights, and constitutes a breach of the implied covenant of good faith and dealing present in the contracts.

306.    As a result of Trinity's breach of the implied covenant of good faith and fair dealing, Ms. Johnson has sustained substantial monetary losses and other significant damages, including severe mental distress and anguish, loss of academic achievement, and loss of employment opportunities.

**TWELFTH CAUSE OF ACTION:**
**BREACH OF CONTRACT AS TO CAILA FRENCH.**

307.    Ms. French repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

308.    Ms. French applied to an enrolled as a student at Trinity and paid required tuition, fees, and expenses.

309.    Ms. French's application to and enrollment as a student at Trinity was done in reliance on Trinity's representations, and with the reasonable expectation, that, Trinity would implement and enforce the provisions and policies set forth in its official publications, including

\#

\#

its Student Handbook and its Sexual Harassment Policy, as well as all supporting and explanatory

documents produced, published, and/or disseminated by Trinity.

310.    An express contract or, alternatively, a contract implied in law or in fact was formed

between Ms. French and Trinity.

311.    Ms. French has performed all conditions required of her under the terms of the

Trinity Publications.

312.    Trinity breached its contract with Ms. French in numerous ways, including but not

limited to one or more of the following ways:

a.   Trinity failed to complete its investigation in the timeline provided under its policies.

b.   Trinity failed to investigate Ms. French's reports of potential violations of Trinity Publications, including, but not limited to, potential sexual misconduct, harassment, and sexual assault.

c.   Trinity conducted an inadequate and incomplete investigation of the charges against the Student-Attacker.

d.   Trinity failed to comply with Title IX, as set forth above.

e.   Trinity failed to provide an environment free from discrimination and harassment and its promise to address sexual misconduct.

f.   Trinity failed to respond promptly and thoroughly to complaints, taking years to get to a final investigative report and disciplinary action.

g.   Trinity denied Ms. French equal access to and participation in educational opportunities and benefits.

#

#

313.    As a result of Trinity's breach of the Trinity Publications, including but not limited to as set forth above, Ms. French has sustained substantial monetary losses and other significant damages, including severe mental distress and anguish, and loss of academic achievement.

**THIRTEENTH CAUSE OF ACTION:**
**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**
**AS TO CAILA FRENCH.**

314.    Ms. French repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

315.    The Trinity Publications, including the Sexual Harassment Policy and the Student Handbook, each contained an implied covenant of good faith and fair dealing pursuant to which Trinity was obligated to deal with Ms. French in a fair, reasonable, and equitable matter to ensure that she received all benefits to which she was entitled under the Trinity Publications.

316.    By engaging in the foregoing conduct, Trinity callously, willfully, and deliberately disregarded Ms. French's rights under the Trinity Publications.

317.    Trinity's unreasonable and intentional conduct in failing to comply with its contractual obligations was in reckless, wanton, deliberate, malicious and callous disregard of Ms. French's rights, and constitutes a breach of the implied covenant of good faith and dealing present in the contracts.

318.    As a result of Trinity's breach of the implied covenant of good faith and fair dealing, Ms. French has sustained substantial monetary losses and other significant damages, including severe mental distress and anguish, and loss of academic achievement.

*   *   *

\#

\#

**WHEREFORE,** the Plaintiffs request that this Court:

a.  Accept jurisdiction over this action;

b.  Empanel a jury to fairly hear and decide this action;

c.  Award to the Plaintiffs compensatory damages against the Defendant in an amount to be determined at trial;

d.  Award to Plaintiffs a declaratory judgment that the Defendant's treatment of them violated Title IX;

e.  Award to Plaintiffs consequential damages against the Defendant in an amount to be determined at trial;

f.  Award punitive damages against Defendant in an amount to be determined at trial;

g.  Award reasonable attorneys' fees, costs, and disbursements;

h.  Award to the Plaintiffs compensatory damages

i.  Award to the Plaintiffs economic damages; and

j.  Award to the Plaintiffs such other relief as it deems just and proper.

**RESPECTFULLY SUBMITTED,**
**THE PLAINTIFFS**

By: ___/s/ *Nina T. Pirrotti*_____

Nina T. Pirrotti  (*ct26792*)
Joshua R. Goodbaum  (*ct28834*)
Jordan E. Sala  (*ct30627*)
**GARRISON, LEVIN-EPSTEIN, RICHARDSON,**
**FITZGERALD & PIRROTTI, P.C.**
405 Orange Street | New Haven, CT  06511
Tel.: (203) 777-4425 | Fax: (203) 776-3965
E-mail:  npirrotti@garrisonlaw.com
jgoodbaum@garrisonlaw.com
jsala@garrisonlaw.com

COUNSEL FOR THE PLAINTIFFS