## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | : | |
| CAILA FRENCH AND JAZMIN JOHNSON, | : | |
|     Plaintiffs, | : | CIVIL ACTION NO. |
| | : | 3:22-CV-01199-RNC |
| v. | : | |
| | : | |
| THE TRUSTEES OF TRINITY COLLEGE | : | |
| d/b/a TRINITY COLLEGE, | : | DECEMBER 22, 2022 |
|     Defendant. | : | |

## MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

THE DEFENDANT,
THE TRUSTEES OF TRINITY COLLEGE
d/b/a TRINITY COLLEGE

By: /s/ James M. Sconzo
James M. Sconzo (ct04571)
Jonathan C. Sterling (ct24576)
Amanda M. Brahm (ct30581)
CARLTON FIELDS, P.C.
One State Street, Suite 1800
Hartford CT 06103
Phone: 860-392-5000
Fax: 860-392-5058
jsconzo@carltonfields.com
jsterling@carltonfields.com
abrahm@carltonfields.com
Its attorneys

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. v

I.      PRELIMINARY STATEMENT ...................................................................................1

II.     BACKGROUND ..........................................................................................................2

     A.     Trinity's Title IX Policy...................................................................................2

     B.     Plaintiffs' Personal Experiences ......................................................................4

           1.     The Plaintiffs Enrolled at Trinity .........................................................4

           2.     The Sexual Assault Against Ms. Johnson.............................................4

           3.     Ms. Johnson's Requests that Trinity Not Investigate Her Claims .............5

           4.     Trinity Provides Supportive Measures to Ms. Johnson ...........................5

           5.     The Sexual Assault Against Ms. French.................................................6

           6.     Ms. Johnson Changes Her Mind and Files a Complaint...........................6

           7.     Trinity Immediately Investigates Ms. Johnson's Complaint ....................7

           8.     Ms. French Makes an Anonymous Report to a Confidential Reporter.......7

           9.     Trinity Completes the Investigation into Ms. Johnson's Allegations and Suspends Respondent for One Year ...........................................8

           10.    Ms. French Confidentially Reports Her Allegations to the Title IX Office and is Provided with Supportive Measures................................8

           11.    Ms. French Changes Her Mind and Files a Complaint on April 22, 2020 . 9

           12.    Trinity Begins Investigating Ms. French's Complaint Days After Receipt ................................................................................................ 10

           13.    Trinity Determines that Further Investigation Is Required......................11

           14.    Trinity Expels Respondent....................................................................12

III.    ARGUMENT...............................................................................................................12

     A.     The Claims Asserted ......................................................................................12

     B.     Legal Standard For A Motion To Dismiss.......................................................12

     C.     Plaintiffs' Title IX Claims Should Be Dismissed ...........................................13

           1.     Title IX Legal Landscape.....................................................................13

a.       Overview of Title IX.................................................................. 13

b.       The Title IX Guidance Covering The Period of These Claims .... 15

2.     Plaintiffs Lack Standing To Assert Their Title IX Claims and Emotional
Distress Damages Are Not Recoverable.................................................. 16

3.     Some of Ms. Johnson's Title IX Factual Allegations are Time Barred.... 18

4.     Plaintiffs Fail To State Plausible Deliberate Indifference ....................... 20

a.       Ms. Johnson's Title IX Claim (Count I) ....................................... 20

i.       Trinity's Investigation into Ms. Johnson's Allegations.... 20

ii.      Supportive Measures Provided to Ms. Johnson................ 22

b.       Ms. French's Deliberate Indifference Claim (Count II) .............. 23

i.       Ms. French's Pre-Assault Allegations .............................. 23

ii.      Trinity's Investigation of Ms. French's Allegations......... 26

iii.     Supportive Measures Provided to Ms. French.................. 27

D.     Plaintiffs' State Law Claims Should All Be Dismissed.........................................27

1.     Trinity's Actions Are Entitled To Deference............................................ 28

2.     Plaintiffs' Negligence And Negligent Infliction Of Emotional Distress
Claims Fail........................................................................................... 29

a.       The Negligence Claims Are Time-Barred. .................................. 29

b.       The Negligence Claims Are Precluded By Gupta. ...................... 31

3.     Plaintiffs' Wanton And Reckless Misconduct Claims Fail. .................... 33

a.       The Claims are Untimely. .............................................................. 33

b.       There Is No Wanton Conduct Alleged........................................... 33

c.       There Is No Risk Of Bodily Harm Alleged. ................................. 34

4.     Plaintiffs' Breach Of Contract Claims Are Not Plausible. ...................... 34

a.       Standard For Breach Of Contract Claims In The Educational
Context............................................................................................ 34

b.       Plaintiffs Have Not Plausibly Alleged Any Breach Of Contract.. 35

c.      Plaintiffs' Contract Claims Are Disguised As Negligence Claims.
........................................................................................... 37

5.      Plaintiffs' Implied Covenant Claims Are Not Plausible............................ 38

a.      There Are No Plausible Allegations Of Bad Faith. ...................... 38

b.      An Adequate Statutory Remedy Exists......................................... 40

IV.   CONCLUSION................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..........................................................................................................12, 13

*Bass v. Miss Porter's Sch.*,
  738 F. Supp. 2d 307 (D. Conn. 2010)...............................................................................29, 31

*Bonnewitz v. Baylor Univ.*,
  2022 WL 2688399 (W.D. Tex. 2022)......................................................................................17

*Brock v. Waldron*,
  127 Conn. 79 (1940).................................................................................................................34

*Butters v. James Madison Univ.*,
  208 F. Supp. 3d 745 (W.D. Va. 2016) ....................................................................................22

*Campbell v. Plymouth*,
  74 Conn.App. 67 (2002) ..........................................................................................................40

*Cannon v. Univ. of Chi.*,
  441 U.S. 677 (1979).................................................................................................................14

*A.Q.C. ex rel. Castillo v. United States*,
  656 F.3d 135 (2d Cir. 2011).....................................................................................................20

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
  142 S. Ct. 1562 (2022)..................................................................................................14, 17, 18

*Daley v. Wesleyan University*,
  63 Conn.App. 119 (2001) ........................................................................................................39

*Davis as Next Friend of La Shonda D. v. Monroe Cty. Bd. of Educ.*,
  526 U.S. 629 (1999)......................................................................................................14, 15, 26, 29

*Doe v. Bd. of Regents of Univ. of Neb.*,
  2022 WL 3566990 (D. Neb. 2022) ..........................................................................................18

*Doe v. Brandeis Univ.*,
  177 F. Supp. 3d 561 (D. Mass 2016) .......................................................................................29

*Doe v. Brown University*,
  210 F. Supp. 3d 310 (D.R.I. 2016)...........................................................................................29

*Doe v. City of Pawtucket*,
    2022 WL 4551953 (D.R.I. 2022) ...................................................................18

*Doe v. Purdue Univ.*,
    2022 WL 3279234 (N.D. Ind. 2022) .............................................................18

*Doe v. Quinnipiac Univ.*,
    404 F. Supp. 3d 643 (D. Conn. 2019) .........................................................29

*Doe v. Trustees of Columbia Univ. in City of New York*,
    No. 21 CIV. 5839 (ER), 2022 WL 3666997 (S.D.N.Y. Aug. 25, 2022) ...............16

*Doe v. Wesleyan Univ.*,
    No. 3:19-CV-01519 (JBA), 2022 WL 2656787 (D. Conn. July 8, 2022) .........35, 37

*Dongguk University v. Yale University*,
    734 F.3d 113 (2d Cir. 2013) .........................................................................34

*Dubay v. Irish.*
    207 Conn. 518 (1988) ...................................................................................33

*Dubinsky v. Meyers, Breiner & Kent, LLP*,
    No. FBTCV156052685S, 2016 WL 1553008 ...............................................39

*Egbarin v. Hoffmann & Assocs.*,
    No. 3:18-cv-917 (VAB), 2019 WL 1129454 (D.Conn. Mar. 12, 2019) ..............2

*Faigel v. Fairfield Univ.*,
    815 A.2d 140 (Conn.App.2003) ...................................................................36

*Faigel v. Fairfield University*,
    75 Conn. App. 37 (2003) ...............................................................................35

*Faust v. Connecticut Junior Republic Ass'n.*,
    2000 WL 254570 (Conn. Super. Feb. 23, 2000) ..........................................28

*Feminist Majority Found. v. Univ. of Mary Washington*,
    283 F. Supp. 3d 495 (E.D. Va. 2017) .........................................................22

*Fitzgerald v. Barstable Sch. Comm.*,
    504 F.3d 165 (1st Cir. 2007), rev'd on other grounds, 555 U.S 236 (2009) ...........27

*Franklin v. Gwinnett Cty. Pub. Schs.*,
    503 U.S. 60 (1992) .......................................................................................14

*Freeman v. Sansom*,
    No. 3:22-CV-00331-JBA, 2022 WL 17272373 (D. Conn. Nov. 29, 2022) .............2

*Gazo v. City of Stamford*,
255 Conn. 245 (2001) ..................................................................................................38

*Gebser v. Lago Vista Indep. Sch. Dist.*,
524 U.S. 274 (1998) ...................................................................................................15

*Gupta v. New Britain General Hospital*,
239 Conn. 574 (1996) ..................................................................................... *passim*

*Habetz v. Condon*,
224 Conn. 231 (1992) .................................................................................................39

*Hope Academy v. Friel*,
No. CV030081183S, 2004 WL 1888909 (Conn.Super. Jul. 22, 2004) ...........34, 35

*Hutchinson v. Univ. of Saint Joseph*,
No. 3:21-CV-325(RNC), 2022 WL 19339 (D. Conn. Jan. 3, 2022).......................35

*Johnson v. Town of N. Branford*,
64 Conn. App. 643, 781 A.2d 346 (2001) ...............................................................30

*Karasek v. Regents of the Univ. of Cal.*,
No. 15 Civ. 03717 (WHO), 2015 WL 8527338 (N.D. Cal. Dec. 11, 2015) ...........24

*Kim v. State Farm Fire and Casualty Company*,
No. 3:15-cv-879 (VLB), 2015 WL 6675532 ...........................................................39

*Kiryas Joel Alliance v. Village of Kiryas Joel*,
495 Fed.Appx. 183 (2d Cir.2012).....................................................................16, 17

*L-7 Designs, Inc. v. Old Navy*,
LLC, 647 F.3d 419 (2d Cir. 2011) ............................................................................13

*Leader v. Harvard Univ. Bd. of Overseers*,
No. 16-10254-DJC, 2017 WL 1064160 (D. Mass. Mar. 17, 2017) .........................15

*Madej v. Yale Univ.*,
No. 3:20-CV-133 (JCH), 2020 WL 1614230 (D. Conn. Mar. 31, 2020) ...............31

*Makarova v. United States*,
201 F.3d 110 (2d Cir.2000).......................................................................................16

*Mara v. MacNamara*,
2015 WL 4392956 (D. Conn. July 15, 2015) ..........................................................28

*Matthiessen v. Vanech*,
266 Conn. 822 (2003) .................................................................................................34

*Medina-Corchado v. Univ. of New Haven*,
   No. 3:21-CV-132 (JAM), 2022 WL 279871 (D. Conn. Jan. 31, 2022)......................20, 35, 36

*Okafor v. Yale Univ.*,
   No. CV–98–0410320–S, 2004 WL 1615941 (Super. Ct. June 25, 2004)...............................37

*Pack 2000, Inc. v. Cushman*,
   311 Conn. 662 (2014) ............................................................................................................37

*Packer v. Bd. of Edu. of Town of Thomaston*,
   246 Conn. 89 (1998) (Norcott, J., concurring) ....................................................................29

*Pelletier v. Galske*,
   105 Conn.App. 77 (2007), cert. denied, 285 Conn. 921 (2008) ............................................38

*Peralta v. Cendant Corp.*,
   123 F. Supp. 2d 65 (D. Conn. 2000)......................................................................................36

*Pickering v. Aspen Dental Management, Inc.*,
   100 Conn.App. 793 (2007) ....................................................................................................40

*Purcell v. New York Inst. of Tech.-Coll. Of Osteopathic Medicine*,
   931 F.3d 59 (2d Cir. 2019)......................................................................................................18

*Rafalko v. University of New Haven*,
   129 Conn. App. 44 (2011) ......................................................................................................29

*Roe v. St. Louis Univ.*,
   746 F.3d 874 (8th Cir. 2014) ..................................................................................................21

*Roskin-Frazee v. Columbia Univ.*,
   No. 17 CIV. 2032 (GBD), 2018 WL 6523721 (S.D.N.Y. Nov. 26, 2018).................21, 24, 26

*Pension Benefit Guar. Corp. ex rel. Saint Vincent Catholic Med. Ctrs. Ret. Plan v.*
   *Morgan Stanley Inv. Mgmt. Inc.*,
   712 F.3d 705 (2d Cir. 2013)....................................................................................................13

*Shank v. Carleton Coll.*,
   232 F. Supp. 3d 1100 (D. Minn. 2017) ..................................................................................24

*Smith v. Bridgeport Futures Initiative, Inc.*,
   No. 326697, 1996 WL 493229 (Conn. Super. Aug. 13, 1996)...............................................38

*Soule v. Connecticut Ass'n of Sch., Inc.*,
   No. 21-1365-CV, 2022 WL 17724715 (2d Cir. Dec. 16, 2022) .............................................17

*Thibodeau v. Design Group One Architects, LLC*,
   260 Conn. 691 (2002) ............................................................................................................40

*Thomas v. Bd. of Trs. of the Neb. State Colls.*,
    2016 WL 3564252 (8th Cir. July 1, 2016)..............................................................25

*Thomas v. Meharry Med. Coll.*,
    1 F. Supp. 3d 816 (M.D. Tenn. 2014).................................................................26

*Weiner v. Clinton*,
    106 Conn.App. 379, cert. denied, 282 Conn. 928 (2008) ...................................37

*Williams v. Bd. of Regents of Univ. Sys. of Georgia*,
    477 F.3d 1282 (11th Cir. 2007) .........................................................................25

*Zamora v. N. Salem Cent. Sch. Dist.*,
    414 F.Supp.2d 418 (S.D.N.Y. 2006)...................................................................25

**Statutes**

20 U.S.C. §§ 1681–88...............................................................................................13

20 U.S.C. § 1681(a) ..................................................................................................13

20 U.S.C. § 1682 .......................................................................................................15

Conn. Gen. Stat. Ann. § 52-577 ...............................................................................19

Conn. Gen. Stat. § 10-55m..........................................................................................2

General Statutes § 52–584 ........................................................................................33

**Other Authorities**

34 C.F.R. Part 106.....................................................................................................16

85 Fed. Reg. 30,061 (May 19, 2020) ........................................................................16

Governor Lamont's Executive Order 7G..................................................................19

Rule 12(b)(1).............................................................................................................16

Rule 12(b)(6).............................................................................................................18

**<u>OTHER AUTHORITIES</u>**

D. Conn. L. Civ. R. 7 ......................................................................................................................1

Title IX of the Education Amendments of 1972, 20 U.S.C.A. § 1681 *et seq.*....................... passim

Pursuant to Fed. R. Civ. P. 12(b)(1) and (6) and D. Conn. L. Civ. R. 7, Defendant, The Trustees of Trinity College d/b/a Trinity College ("Trinity"), submits this memorandum of law in support of its Motion to Dismiss Plaintiffs' November 16, 2022 Amended Complaint (the "AC").

## I.     PRELIMINARY STATEMENT

Trinity is committed to gender equality and preventing and eliminating sexual misconduct in its programs. It has clear policies explaining that Trinity will not discriminate on the basis of sex, and has established rules against sexual misconduct by faculty, staff and students, and a process to fairly adjudicate complaints of sexual misconduct. Its policies make clear that students are accountable for sexual misconduct.

Plaintiffs' allegations and the documents incorporated by reference in the AC bear all that out. Plaintiffs' accounts of the sexual assaults they suffered while students at Trinity, and their own recitation of the events, establish that Trinity responded appropriately to Plaintiffs' initial reports and to their subsequent formal complaints. Plaintiffs have not plausibly alleged a violation of Title IX or any other legal theory.

Plaintiffs' Title IX claims rest on conclusory allegations that Trinity failed to conduct timely investigations and did not provide Plaintiffs with adequate support. But as is clear by the AC and communications incorporated by reference, both Plaintiffs repeatedly indicated that they did not want to pursue complaints or move forward with an investigation into the underlying incidents until years after they occurred. Once Plaintiffs changed their minds, and decided to initiate the investigation and adjudication process, Trinity promptly and equitably applied its process. Throughout, Trinity provided timely supportive measures and accommodations to both Plaintiffs—even beyond those that Plaintiffs requested. Plaintiffs therefore do not plausibly allege that Trinity was "deliberately indifferent" for the purposes of liability under Title IX.

Plaintiffs' state law claims fare no better because each claim is simply a challenge to

Trinity's application of its policies and discipline procedures. In this context, Trinity's decisions are entitled to deference and should not be disturbed by this Court because Trinity acted in accordance with (1) the express terms of its applicable policy, and (2) Plaintiffs' own wishes—two discernable rational bases. Moreover, many of Plaintiffs' claims, and the factual allegations that underpin them, are subject to dismissal because they are untimely. As such, Plaintiffs' entire AC should be dismissed.

## II.     BACKGROUND

### A.     Trinity's Title IX Policy

The *Trinity College Policy on Sexual Misconduct* (the "Policy") contains Trinity's policies against sex discrimination, as was required by the United States Department of Education (the "DOE"). *See* Exhibit 1.[1] The Policy, as amended periodically, was in effect at all times during the Plaintiffs' enrollment at Trinity.

The Policy has always complied with the operative guidance from the DOE and Conn. Gen. Stat. § 10-55m.  Among other things, the Policy includes the procedures for the prompt and equitable resolution of complaints of discrimination based on sex.

The Policy prohibits "sexual assault," defined as "any intentional sexual contact without consent, whether contact directly touches skin or is through clothing" and "rape," defined as "sexual penetration without consent." Exhibit 1, p. 5. Trinity "strongly encourages individuals to report incidents of sexual misconduct so that any victim of alleged sexual misconduct may gain

---

[1] In addition to facts asserted in the AC, the Court may consider "documents incorporated in the complaint by reference" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Egbarin v. Hoffmann & Assocs.,* No. 3:18-cv-917 (VAB), 2019 WL 1129454, at *3 (D.Conn. Mar. 12, 2019) (quotations omitted).  Plaintiffs' AC relies on and incorporates by reference many documents.  Those relevant to this motion are attached as exhibits.  For purposes of this motion, Trinity treats Plaintiffs' factual allegations as true so far as they are consistent with the underlying documents that Plaintiffs purport to rely on or characterize. *See also Freeman v. Sansom*, No. 3:22-CV-00331-JBA, 2022 WL 17272373 at *3 (D. Conn. Nov. 29, 2022), (considering a variety of exhibits submitted by the defendant in a Section 1983 case to "the extent that they

access to available support and allow the College to respond appropriately." **A report "may be made verbally or in writing," but in order to "initiate the [Policy's] complaint process" a complaint "will ultimately need to be recorded in written form."** Exhibit 1, p. 16[2] (emphasis added).

The Policy takes into account that a student may not wish to make a complaint. In such cases, after receiving a report, but prior to any investigation or adjudication of a complaint, the Policy describes that the "Complainant and/or Reporter may request . . . that the College not take action on the report. . . ." Exhibit 1, p. 13. The Policy warns that while **"the College may respect a request for confidentiality" doing so "may limit the College's ability to commence disciplinary proceeding**." Exhibit 1, p. 14.

On the other hand, if a student initiates the complaint process, the Policy describes the steps that Trinity will take to investigate and adjudicate the complaint.[3] An investigator is engaged for fact-finding. Exhibit 1, p. 19. The Complainant and Respondent are permitted to identify all relevant evidence and witnesses that they would like the investigator to review and interview. During the process, "Complainants and Respondents are entitled to the same opportunities to have an adviser or support person of their choice (who may be an attorney or someone with legal training) present at any meeting or proceeding." AC ¶¶ 35.r, 109; Exhibit 1, p. 18. At the conclusion of the fact-finding process, the investigator must "compile the results" into a preliminary report, which is shared with the Complainant and Respondent for their review and response. Exhibit 1, p. 20. The Complainant and Respondent are permitted to rebut each other's responses in writing, and those written statements are provided to the investigator for

---

demonstrate the process [p]laintiff received.)
[2] Any bold emphasis added throughout this brief was supplied by Trinity, unless indicated otherwise.
[3] The Policy also explains the process for reporting sexual misconduct to local law enforcement, including all

inclusion in the investigator's final report. Exhibit 1, p. 20. The final report must also include the investigator's determination of whether or not the Complainant's allegations are substantiated, by a preponderance of the evidence. Exhibit 1, p. 20.

The investigator then permits the Complainant and Respondent to submit a written response to the final report.  The final report, including the written responses, is then submitted to an Administrative Panel, which is convened to "determine whether the findings, as presented in the investigative report, violate College [P]olicy." Exhibit 1, p. 21. If the Administrative Panel finds that the Policy has been violated, the Complainant and Respondent are permitted to submit impact statements to the Administrative Panel, which are considered by the Panel when determining an appropriate sanction.  Exhibit 1, p. 21.

### B.    Plaintiffs' Personal Experiences

#### 1.    The Plaintiffs Enrolled at Trinity

Plaintiffs, Jazmin Johnson and Caila French, enrolled as first year students at Trinity for the Fall 2017 semester. AC ¶¶ 43, 44.

#### 2.    The Sexual Assault Against Ms. Johnson

In the early hours of September 23, 2017, Ms. Johnson entered her dormitory building with another Trinity student (the "Respondent"[4]). AC ¶ 48. Respondent touched Ms. Johnson without her consent. AC ¶ 48. Later that same day, Ms. Johnson reported the incident to her "friends from home" through text messages, alleging that Respondent:

- had put his "hands [] on [her] boobs;"
- "tried to put his hands in her pants" and "like took off [her] shirt somewhat;"
- said Ms. Johnson "had to go to his room with him."

---

relevant contact information. Exhibit 1, p. 26.
[4] The Respondent is the former Trinity student identified at AC ¶ 4.

AC ¶ 51; *See* Exhibit 2 (the "September 2017 Allegations"). [5]  At the time, Ms. Johnson confided in her friend that she felt she was "fucked [because Trinity was] probably gonna make [her] tell someone," which was upsetting to Ms. Johnson because she didn't "want to have to say anything against [Respondent] specifically." Exhibit 2.

3.      Ms. Johnson's Requests that Trinity Not Investigate Her Claims

The mother of Ms. Johnson's friend intercepted these text messages on the same day that Ms. Johnson sent them. The mother took screenshots of the messages and provided them to Trinity's Swimming and Diving Coach, Carlos Vega. AC ¶ 52; Exhibit 2. Coach Vega immediately reported the incident to the Title IX Office. Exhibit 5.

In response to Coach Vega's report, Trinity took several important actions. First, Trinity's then-Title IX Coordinator, Timothy Dunn, contacted Ms. Johnson and arranged to meet with her. AC ¶ 56. At the initial meeting, Ms. Johnson explained that she:

> **had no interest at all in pursuing an investigation. [She] did not even give Mr. Dunn [Respondent's] name at the time of [their] first meeting because [she] was so uninterested in reporting the incident at all.**

AC ¶¶ 56, 57; Exhibit 6. Ms. Johnson provided the Title IX Office with information that "**was as vague as possible**." Compl. ¶ 57, Exhibit 7.

4.      Trinity Provides Supportive Measures to Ms. Johnson

Even though Ms. Johnson did not want to file a complaint about the incident or proceed with an investigation, Trinity still provided Ms. Johnson with supportive measures. AC ¶¶ 58, 69; Exhibit 1, p. 10. Trinity immediately changed Ms. Johnson's room so she did not have to be in the same dormitory with Respondent. AC. ¶ 58. Trinity also entered a No Contact Order,

---

[5] Ms. Johnson did not disclose Respondent's name in the text messages and these text messages, incorporated in the AC at ¶ 51, were not provided to Trinity until more than a year *after* the sexual assault occurred. Exhibit 3 (the Final Investigative Report), p. 2; Exhibit 4 (text messages attached as Exhibit B to the Final Investigative Report).

prohibiting Respondent from contacting Ms. Johnson. This was done after Respondent self-reported to the Title IX Office because he had heard "rumors" about Ms. Johnson's allegations. AC ¶ 69; *see also* Exhibit 6 ("**I did not even give Mr. Dunn [Respondent's] name . . . In fact, Title IX had no name to the case until [Respondent] approaches his RA with claims that [Ms. Johnson] was trying to 'ruin his reputation.' [Respondent] gave his own name to Title IX.**") Ms. Johnson did not request the No Contact Order, but confirmed that she "was very grateful" that Trinity took this step on her behalf. Exhibit 8.

Ms. Johnson did not provide the Title IX Office with any additional information about this incident or Respondent during the 2017-2018 school year and Trinity did not receive any other reports about him during that school year.[6]

### 5.  The Sexual Assault Against Ms. French

During the summer after the 2017-2018 school year, Ms. French remained on campus. AC. ¶ 72. On June 22, 2018, Ms. French spent the evening on campus with friends, including Respondent. Exhibit 10. Ms. French became "drunk/high" over the course of the night before returning to her dorm room with Respondent. Exhibit 10. Thereafter, Respondent had sex with Ms. French while she was too incapacitated to consent. AC ¶ 73; Exhibit 10. Ms. French does not allege that she reported this violation to anyone at the time it occurred.

### 6.  Ms. Johnson Changes Her Mind and Files a Complaint

In September 2018—a year after Ms. Johnson was assaulted, and three months after Ms. French was assaulted—Ms. Johnson changed her mind and decided to file a complaint about

---

[6] In the Spring 2018 semester, Trinity hired a new Title IX Coordinator, Venice Ross. On February 6, 2018, Ms. Ross emailed Ms. Johnson to inform her that she had taken over the position and invited Ms. Johnson to stop into her office. AC. ¶¶ 86, 87; Exhibit 9. Ms. Johnson did not respond to the email or stop by the Title IX Office that semester.

Respondent with the Title IX Office. AC ¶ 99.[7]  Ms. Johnson met with Ms. Ross on September 18, 2018. AC ¶ 102, Exhibit 11. Afterwards, Ms. Johnson submitted a written complaint and Trinity initiated an investigation. AC ¶ 106; Exhibit 12 (the "October 2018 Complaint"). The October 2018 Complaint contained allegations similar to but not identical to the September 2017 allegations.[8]

### 7.    Trinity Immediately Investigates Ms. Johnson's Complaint

After Ms. Johnson indicated she wanted to proceed with an investigation, Ms. Ross retained an attorney with substantial experience investigating Title IX matters, to investigate the October 2018 Complaint. AC ¶ 106; Exhibit 3. The investigator began interviewing witnesses on October 9, 2018. AC ¶ 106; Exhibit 3.

### 8.    Ms. French Makes an Anonymous Report to a Confidential Reporter

On November 1, 2018, Ms. French attended a training on sexual misconduct at Trinity. AC ¶¶ 77, 123; Exhibit 10. As a result of this training, Ms. French realized that "she was a victim," and reported that she had been raped to a Women & Gender Resource Action Center ("WAGRAC") employee. AC ¶ 123; Exhibit 13. The next day, the WAGRAC employee filed an anonymous report with the Title IX Office.[9] AC ¶ 123; Exhibit 13. Ms. French did not reveal Respondent's identity, but limited her disclosure to having been raped by a current student and that the "incident occurred in summer 2018." Exhibit 13. The WAGRAC employee documented

---

[7] As explained in FN 6, contrary to Ms. Johnson's allegations that she was "surprised to learn that [Mr. Dunn] had left" and was unaware that "Title IX resources had changed" she was informed of this fact seven months prior in February 2018. AC ¶ 90 Exhibit 9.

[8] In the October 2018 Complaint, Ms. Johnson alleged, for the first time, that Respondent had also "attempted to kiss" her and "pinch[ed] [her] nipples." AC ¶ 90; Exhibit 12.  At no point did Ms. Johnson allege, however, that Respondent "attempted to rape" her.

[9] Ms. French alleges that, around the same time, she reported what had happened to "several of her professors." AC ¶ 77. Although Ms. French alleges that these professors had a duty to report the information to the Title IX office but failed to do so, that makes no difference because she admits the WAGRAC employees did so.  AC ¶¶ 78, 79. Moreover, Ms. French does not allege that she provided Respondent's name to her professors.

her efforts to refer Ms. French to the Title IX Office, WAGRAC, Trinity's counseling and campus safety departments, the Hartford Police Department, and the YWCA, among other resources. Exhibit 13. Ms. French does not allege that she pursued any of these supportive resources when they were offered. Ms. French also does not allege that she expected that Trinity would or could initiate an investigation when she had not identified Respondent.

9.    <u>Trinity Completes the Investigation into Ms. Johnson's Allegations and Suspends Respondent for One Year</u>

Over the course of October and November 2018, the investigator's thorough investigation of Ms. Johnson's allegations included interviews of more than a dozen witnesses and collecting written communications, surveillance footage, key card audit reports, and photographs. Exhibit 3. The investigator then compiled the results of the fact-finding process into a preliminary report that was shared with Ms. Johnson who then provided comments to it on December 22, 2018 and January 20, 2019. AC ¶¶ 113-114; Exhibit 3, at p. 3; Exhibit 6.

The investigator finalized the report on January 28, 2019, which concluded, by a preponderance of the evidence, that Respondent was responsible for violating the Policy. Exhibit 3. Ms. Johnson and Respondent received the final report and were then permitted to submit comments to the report and rebuttals to each other's comments, as permitted by the Policy. AC. ¶ 113-114; Exhibit 1, at p. 20. Thereafter, an Administrative Panel was then convened and on February 28, 2019, determined that Respondent had violated the Policy. AC ¶ 121; Exhibit 14. As a result, Respondent was sanctioned and suspended from Trinity for the 2019-2020 school year. AC ¶ 122.

10.    <u>Ms. French Confidentially Reports Her Allegations to the Title IX Office and is Provided with Supportive Measures</u>

On April 29, 2019—five months after Ms. French made her anonymous report to WAGRAC—she made a report to the Title IX Office. AC ¶ 126. Just like when she reported to

WAGRAC, Ms. French "pleaded that the report remain confidential" and refused Ms. Ross' offer to implement a No Contact Order between Ms. French and Respondent because Ms. French did not "feel she need[ed] it." AC ¶ 128; Exhibit 15 (Ms. Ross' notes attached to the Final Investigative Report at Exhibit 20).

A few days later, on Sunday, May 5, 2019, at 6 pm, Ms. French changed her mind and requested that WAGRAC help her obtain a No Contact Order. AC ¶¶ 134-136, 124; Exhibit 16 (text messages attached to the Final Investigative Report at Exhibit 20). WAGRAC responded to Ms. French that same evening, informing her that WAGRAC had contacted campus safety and offered to meet with Ms. French at 9 am the next morning. At 8:54 am on Monday, May 6, 2019, Ms. Ross contacted Ms. French and issued a No Contact Order two hours later. After that, the Ms. Ross offered to facilitate a dorm room change, but Ms. French declined, choosing instead to "stay[] with [her] friend until school ends." Exhibit 16 (text messages attached to the Final Investigative Report at Exhibit 20). However, Ms. French chose not to pursue a formal complaint at that time.

11.     Ms. French Changes Her Mind and Files a Complaint on April 22, 2020

Respondent began serving his suspension at the end of the spring 2019 semester. He was not permitted to enroll at Trinity for the 2019-2020 school year or be on campus. AC ¶ 122. Neither Plaintiff alleges that she ever had any contact with Respondent after April 2019.

On February 2, 2020, Trinity's new Title IX Coordinator, Rita Kelley, introduced herself to Ms. French via email and "encourage[d]" Ms. French to meet with her so that they could discuss "what options [were] available for [Ms. French]" since Respondent's suspension would end after that semester. AC ¶ 86, 147; Exhibit 17. Ms. French did not respond to the email, so Ms. Kelley followed up a week later by email, "encourag[ing] [Ms. French] to meet with [her]" so that Ms. Kelley could "assist [her] and advise [her] as to the resources that [were] available to

[her]." AC ¶ 86, 147 Exhibit 17.

Ms. French and Ms. Kelley eventually met on February 13, 2020. AC ¶ 147; Exhibit 17.

On February 29, 2020, Ms. French responded, that she was still not ready to proceed with an

investigation:

> **I will proceed with the process when I am ready**. . . . My parents are planning
> to come up when I am ready to delve deeper into this matter. **I believe this
> process should be framed completely by me, on my timeline, my terms and
> when I'm ready.** As a victim I deserve this agency. That being said, I will be in
> contact with you. Thanks again for reaching out. We'll talk soon.

Exhibit 18.

At the end of March, Ms. French informed Ms. Kelley that she would *not* be ready "to

start an investigation [until] the beginning of April after I've gotten back into a routine with my

school work and classes." AC ¶ 147; 148; Exhibit 19. Eventually, on April 22, 2020, almost two

years after the incident, Ms. French submitted her written complaint against Respondent to the

Title IX Office. Exhibit 10.

### 12.   Trinity Begins Investigating Ms. French's Complaint Days After Receipt

Less than a week after Ms. French submitted her complaint, Trinity retained an attorney

experienced in Title IX matters, to investigate. AC ¶ 148; Exhibit 20. "The investigation

commenced immediately" with the investigator interviewing eight witnesses and collecting

relevant evidence such as key card data, floorplans, and text messages. AC ¶ 148; Exhibit 20.

On July 10, 2020, the investigator shared a preliminary report with Ms. French and

Respondent, as required by the Policy. AC ¶ 151; Exhibit 1, p. 20. Ms. French and Respondent

reviewed and responded to the preliminary report and submitted written replies to each other's

responses. AC ¶ 151; Exhibit 1, p. 20, Exhibit 20, p.4. The parties finished submitting their

written responses on July 28, 2020. AC ¶ 151; Exhibit 20, p. 4.

On August 7, 2020, the investigator completed a final report which included a finding

that Respondent was responsible for sexually assaulting Ms. French. AC ¶ 155; Exhibit 21. The investigator could not, however, determine by a preponderance of the evidence, that Respondent raped Ms. French. AC ¶ 155; Exhibit 21. Ms. French requested and was granted an extension until August 28, 2020 to submit her final response to the report. Exhibit 22.

13.     Trinity Determines that Further Investigation Is Required

On August 24, 2020, Ms. Ross discovered handwritten notes that she had created during her April 29, 2019 meeting with Ms. French. AC ¶ 157; Exhibit 15.  In accordance with Trinity's Policy, Ms. Kelley determined that the notes contained relevant information about Ms. French's complaint and that "further investigation" was required. AC ¶ 158; Exhibit 1, p. 20. The notes were relevant because they documented Ms. French explaining to Ms. Ross that she felt physical pain the day after the sexual assault occurred.

Even though Ms. French could have given the same information to the investigator during the investigation, the investigator accepted the notes and engaged in further investigation, which included conducting four additional witness interviews, including a 30-minute follow-up interview with Ms. French. AC ¶ 158; Exhibit 20, p. 3.[10] After the further investigation was completed, the investigator submitted a revised preliminary report which was then shared with Ms. French and Respondent. Thereafter, Ms. French requested and was granted an extension until January 20, 2021 to respond to the report, but ultimately decided not to submit a response because she "did not find anything [she] objected to." AC ¶ 158; Exhibit 23; Exhibit 24. Thereafter, the investigator submitted a revised final report on February 11, 2021. The revised final report included a finding that, by a preponderance of the evidence, Respondent was

---

[10] In this lawsuit Ms. French bases much of her Title IX claim on her assertion that Ms. Ross discovered her notes late in the investigation, but Ms. French was the source of that information and she doesn't have a plausible basis to blame Trinity because she elected not to disclose the same information to the investigator.

responsible for both sexual assault and rape. AC ¶ 162; Exhibit 20.

                14.    <u>Trinity Expels Respondent</u>

Ms. Kelley then convened an Administrative Panel to consider the investigator's findings, and on March 16, 2021, Respondent was found responsible for violating Trinity's Policy on affirmative consent, rape, and sexual assault. Exhibit 25. Ms. French was informed of this outcome and on March 17, 2021, requested an extension of time to March 26, 2021 to submit her impact statement. Exhibit 25. On April 8, 2021, Ms. French was informed that Respondent was expelled from Trinity. AC ¶ 162; Exhibit 26.

## III.   <u>ARGUMENT</u>

### A.   The Claims Asserted

Plaintiffs filed their original Complaint on September 23, 2022 and thereafter filed the AC on November 15, 2022, asserting the following claims:

| Cause of Action | Claim |
|---|---|
| I | Deliberate Indifference in Violation of Title IX (Ms. Johnson) |
| II | Deliberate Indifference in Violation of Title IX (Ms. French) |
| III | Negligence (Ms. Johnson) |
| IV | Negligence (Ms. French) |
| V | Negligent Infliction of Emotional Distress ("NIED") (Ms. Johnson) |
| VI | NIED (Ms. French) |
| VII | Reckless and Wanton Misconduct (Ms. Johnson and Ms. French) |
| VIII | Breach of Contract (Ms. Johnson) |
| IX | Breach of Covenant of Good Faith and Fair Dealing (Ms. Johnson) |
| X | Breach of Contract (Ms. French) |
| XI | Breach of Covenant of Good Faith and Fair Dealing (Ms. French) |

### B.   Legal Standard For A Motion To Dismiss

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A "formulaic recitation of the elements of a cause of action will not do," "[n]or does a complaint

suffice if it tenders `naked assertions' devoid of `further factual enhancement. "' Id. (quoting *Twombly*, 550 U.S. at 555, 557) (alterations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. "Plausibility ...depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy*, LLC, 647 F.3d 419, 430 (2d Cir. 2011).

In short, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown "that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Pension Benefit Guar. Corp. ex rel. Saint Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc*., 712 F.3d 705, 717-718 (2d Cir. 2013).

### C.   Plaintiffs' Title IX Claims Should Be Dismissed

#### 1.   Title IX Legal Landscape

Trinity's Policy and the actions Trinity took to address Plaintiffs' Title IX reports were consistent with Title IX and the operative DOE guidance.

##### a.   *Overview of Title IX*

Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88 ("Title IX"), provides  that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Under the Constitution's Spending Clause at Article I, Section 8, Clause 1, Congress enacted Title IX to mandate nondiscrimination as a condition to receive federal funding in an education program or activity. *Id*. Title IX applies to federally-funded schools at all levels of education. Trinity is

subject to Title IX.

Title IX does not expressly provide for a private right of action. However, the Supreme Court has recognized a limited implied right of action under Title IX, which allows for the recovery of monetary damages, but not damages caused by emotional distress. *Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60 (1992); *Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979); *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1571 (2022). Because Congress enacted Title IX under the Spending Clause, "private damages actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue." *Davis as Next Friend of La Shonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). The Supreme Court has made clear, "a recipient of federal funds may be liable in damages under Title IX only for its own misconduct. The recipient itself must 'exclud[e] [persons] from participation in, . . . den[y] [persons] the benefits of, or . . . subject[] [persons] to discrimination under its program[s] or activit[ies] in order to be liable under Title IX." *Id.* (alterations in original.) The Supreme Court therefore rejected the application of agency or constructive notice principles to impute Title IX liability to a funding recipient and declined to impose the equivalent of a negligence standard.

A school's liability in the context of student-on-student sexual harassment is confined to "certain limited circumstances," where the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* 642–43 (1999). Thus, a school can be liable for the alleged harassment only when the following three conditions are satisfied: (1) the harassment must be "sexual" in nature; (2) the harassment must be "so severe, pervasive, and objectively offensive," and must have "so undermine[d]" and "detract[ed]" from the student's educational experience that it effectively "bar[red]" the student from access to educational opportunities or benefits; and

14

(3) the school had actual knowledge of the harassment and its response was "clearly unreasonable in light of the known circumstances." *Id*. at 633, 648, 650, 651. *Davis* made it clear that this is not merely a matter of evidentiary proof, but a pleading standard as well. *Id*. at 649. The standard "has been purposely set high to eliminate any risk that the [Title IX funding] recipient would be liable in damages not for its own official decision but instead for a [third party's] independent actions." *Leader v. Harvard Univ. Bd. of Overseers*, No. 16-10254-DJC, 2017 WL 1064160, at * 4 (D. Mass. Mar. 17, 2017) (quoting *Davis*, 526 U.S. at 643) (internal quotation marks omitted).

    b.    The Title IX Guidance Covering The Period of These Claims[11]

Title IX's administrative landscape evolved considerably between 2017 and 2020. On September 22, 2017[12], the DOE withdrew earlier statements of Title IX policy and guidance that it had previously issued and instead referred schools to its 2001 Revised Sexual Harassment Guidance (the "2001 Guidance")[13] and the Office for Civil Rights' ("OCR") *Questions and Answers on Campus Sexual Misconduct (September 2017)*. The 2001 Guidance did not require a school to initiate a formal investigation into every report of sexual harassment and did not require schools to adopt any particular investigation or grievance procedures. Instead, under the 2001 Guidance, a school "carried out its burden under the Title IX regulations" when it "respond[ed] [to known sexual harassment] by taking prompt and effective action to end the harassment and prevent its reoccurrence." 2001 Guidance p. 12. Of course, the DOE recognized

---

[11] Title IX directs federal agencies, such as the DOE, to establish requirements to effectuate the nondiscrimination mandate and allows the agencies to issue regulations to enforce Title IX compliance. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287-88 (1998); 20 U.S.C. § 1682. As *Gebser* makes clear, though, compliance with these regulations is ordinarily the subject of federal administrative oversight, review, and enforcement, and does not form the basis of a private right of action. *Id*. ("We have never held, however, that the implied private right of action under Title IX allows recovery in damages for violation of those sorts of administrative requirements.").
[12] *See* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.
[13] Available at, https://www2.ed.gov/about/offices/list/ocr/docs/shguide.

15

that the "**scope of a reasonable response also may depend upon whether a student . . . reporting harassment asks that the student's name not be disclosed to the harasser or that nothing be done about the alleged harassment**." 2001 Guidance at p. 17.

The 2001 Guidance was operative until August 2020, when the DOE's new regulations governing sexual harassment, codified at 34 C.F.R. Part 106, became effective. Significantly, for the purposes of this litigation, the DOE was clear that it would "not enforce these regulations retroactively." 85 Fed. Reg. 30,061 (May 19, 2020); s*ee also* OCR's *Questions and Answers on the Title IX Regulations on Sexual Harassment* (July 2021), at p. 10 ("The 2020 amendments took effect on August 14, 2020 and are not retroactive. This means a school must follow the requirements of the Title IX statute and the regulations that were in effect at the time of the alleged incident . . . This is true even if the school's response was on or after that date."); *see also Doe v. Trustees of Columbia Univ. in City of New York*, No. 21 CIV. 5839 (ER), 2022 WL 3666997, at *11 (S.D.N.Y. Aug. 25, 2022).

2.    Plaintiffs Lack Standing To Assert Their Title IX Claims and Emotional Distress Damages Are Not Recoverable

Plaintiffs' Title IX claims fail as a matter of law because Plaintiffs lack standing. "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.2000). "To survive a defendant's Rule 12(b)(1) motion to dismiss for lack of standing, plaintiffs 'must allege facts that affirmatively and plausibly suggest that [they have] standing to sue.'" *Kiryas Joel Alliance v. Village of Kiryas Joel*, 495 Fed.Appx. 183, 188 (2d Cir.2012) (quoting *Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir.2011)). To establish standing, "[p]laintiffs must 'allege, and ultimately prove, that [they] ha[ve] suffered an injury-in-fact that is fairly traceable to the challenged action of the defendant,

and which is likely to be redressed by the requested relief.'" *Id.* (quoting *Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir.2003). Redressability is an "independent constitutional requirement." *Soule v. Connecticut Ass'n of Sch., Inc*., No. 21-1365-CV, 2022 WL 17724715, at *5 (2d Cir. Dec. 16, 2022) (affirming this Court's decision granting a motion to dismiss claims in Title IX case where the plaintiffs failed to show that it was likely, as opposed to merely speculative, that their alleged injuries would be redressed by a favorable decision).

Plaintiffs cannot plausibly plead that they have suffered any damages that can be redressed by Title IX because the Supreme Court has made clear that emotional distress damages are not recoverable under Title IX. *Cummings*, 142 S. Ct. at 1571. For example, in *Bonnewitz v. Baylor Univ.*, 2022 WL 2688399 (W.D. Tex. 2022), the court applied *Cummings* and recommended dismissing the plaintiff's amended complaint even though the plaintiff sought "money damages." There, the court cut through the plaintiff's "attempts to sever the claimed injury and the relief sought," correctly determining that despite plaintiff's conclusory claims, plaintiff had only alleged damages for "emotional distress and humiliation," which are unavailable under *Cummings*. *Id*. at *4. The same is true here.

Plaintiffs understand that redress for emotional distress is foreclosed by *Cummings*, so in an attempt to keep their claims alive, they try to plead around *Cummings* by alleging that they suffered "money damages." However, it is clear that all of Plaintiffs' damages are the result of psychic injuries. Both Plaintiffs received degrees from Trinity in exchange for the tuition money that they paid and do not allege that Trinity barred them from accessing any educational programs or activities. Instead, Plaintiffs allege that their own "fear" of Respondent caused them to incur "pecuniary losses including the cost of tuition, cost of room and board, moving costs, medical expenses, and psychiatric expenses." AC ¶¶ 214, 231. As the AC explains, Plaintiffs'

"fear for their physical safety" was the reason "they were unable to fully participate in normal college activities, such as attending classes or Student Union—sanctioned events" or "utilizing the same dining hall" as Respondent AC ¶¶ 71, 76, 175, 187. Thus, any "damages" that Plaintiffs incurred are the result of Plaintiffs' psychic injuries. AC ¶¶ 187, 198. All of Plaintiffs' damages claims are the result of their emotional distress and are therefore not capable of redress under *Cummings*.

Moreover, Ms. Johnson's allegation that she "could not work *certain* jobs in the athletic department" does not save her claims. AC ¶ 118 (emphasis added). The AC contains no allegations that the inability to work "certain" jobs resulted in Ms. Johnson losing money. Critically, the AC does not allege that Ms. Johnson was unable to find another on-campus job that paid her the same wage. It was Ms. Johnson's emotional apprehension that caused her inability to work jobs.  It is that emotional injury that she seeks to be compensated for, but the law precludes that.

But even if the Court finds that Plaintiffs have standing, Plaintiff's claims for damages should still be dismissed under Rule 12(b)(6), because they are all for emotional distress, which is not recoverable under Title IX. *See Doe v. Purdue Univ*., 2022 WL 3279234, *13 (N.D. Ind. 2022) ("The Supreme Court's decision [in Cummings] forecloses his claim for 'emotional and psychological damages'"); *Doe v. Bd. of Regents of Univ. of Neb*., 2022 WL 3566990, *4 (D. Neb. 2022) ("Doe concedes that the holding in *Cummings* generally precludes emotional-distress damages in Title IX cases like hers."); *Doe v. City of Pawtucket*, 2022 WL 4551953, *2-3 (D.R.I. 2022).

### 3.    Some of Ms. Johnson's Title IX Factual Allegations are Time Barred

Title IX claims are subject to a three-year statute of limitations. *Purcell v. New York Inst. of Tech.-Coll. Of Osteopathic Medicine*, 931 F.3d 59, 62 & n.10 (2d Cir. 2019) (holding that the

state statute of limitations for personal injury claims applies to Title IX claims); Conn. Gen. Stat. Ann. § 52-577 (requiring that a personal injury action must be brought within three years from the date of the act of omission). This three-year period was modified by the Parties' Tolling Agreement, effective April 22, 2022, that expired September 24, 2022. AC ¶ 19. The Tolling Agreement did not extend the statute of limitations for any claims that had already expired as of April 22, 2022. Nor did the Tolling Agreement extend the statute of limitations beyond September 24, 2022. The Tolling Agreement only suspended the statute of limitations for the period April 22, 2022 to September 24, 2024. It did nothing more.

For purposes of this Motion only, Trinity will assume that Governor Lamont's COVID-related Executive Order 7G further tolled the Title IX statute of limitations.[14] Executive Order 7G tolled statutes of limitations from March 19, 2020 until March 1, 2021 (347 days). As such, assuming Order 7G applies, Plaintiffs would be permitted to bring claims based on events dating back to May 10, 2018—347 days prior to April 22, 2019 (the date three years before the tolling agreement went into effect).

This makes many of Ms. Johnson's Title IX claims untimely. Specifically, Ms. Johnson's claim that Trinity failed to conduct a timely investigation into her September 2017 allegations is barred. Ms. Johnson was aware, long before May 2018, that Trinity was not investigating her September 2017 Allegations *because Ms. Johnson asked Trinity not to investigate*.[15] To the extent Ms. Johnson claims she believed that Trinity would, over her objections, investigate the September 2017 Allegations, she apparently took no action thereafter to check on the status of

---

[14] Trinity fully reserves its right to challenge the applicability of Governor Lamont's order to Title IX claims, and notes that it is aware of no decisions in this District or from the Second Circuit Court of Appeals applying the order to Title IX claims.

[15] Of course, Ms. Johnson is estopped from amending her complaint to allege otherwise because the AC incorporates documents by reference in which Ms. Johnson clearly stated that she instructed the Title IX Office not to investigate

any such investigation. Ms. Johnson was not entitled to wait indefinitely. For her claims to be timely, she would need to establish that, with the exercise of reasonable diligence, she could not have discovered Trinity's inaction in the nearly eight-month period from September 2017 to May 2018. *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 140 (2d Cir. 2011) (explaining that the diligence-discovery rule "avoids unduly extending the limitations period for those who could have timely presented their claim [] had they acted diligently in protecting their interests"). As a matter of law, she cannot do so. As such, to the extent Ms. Johnson's Title IX claims are predicated upon Trinity's failure to investigate her allegations between September 2017 and May 2018, they should be dismissed. *See Medina-Corchado v. Univ. of New Haven*, No. 3:21-CV-132 (JAM), 2022 WL 279871, at *3 (D. Conn. Jan. 31, 2022) (granting the defendant-University's motion to dismiss an untimely Title IX claim).

### 4. Plaintiffs Fail To State Plausible Deliberate Indifference

#### a. *Ms. Johnson's Title IX Claim (Count I)*

Ms. Johnson's claim under Title IX that Trinity acted with "deliberate indifference" rests on two arguments.[16] First, she argues that Trinity failed to conduct a timely investigation. And, second, she argues that Trinity failed to provide adequate supportive measures and accommodations. Neither theory supports a plausible Title IX violation.

##### i. Trinity's Investigation into Ms. Johnson's Allegations

As a matter of law, Trinity's response to Ms. Johnson's allegations was not deliberately indifferent. When Ms. Johnson first brought forward her September 2017 Allegations she was "as vague as possible" because she "had no interest at all in pursuing an investigation." Exhibit

---

her claims in 2017.
[16] Ms. Johnson cannot state a claim for pre-assault liability because she has not alleged that Trinity had actual knowledge of a risk of harm prior to her sexual assault.

6, Exhibit 7.  According to the Policy, which was consistent with the 2001 DOE guidance, Trinity respected Ms. Johnson's wishes about when to investigate. Such a response is not deliberately indifferent.

The Southern District of New York was confronted with nearly identical facts in *Roskin-Frazee v. Columbia Univ*., No. 17 CIV. 2032 (GBD), 2018 WL 6523721, (S.D.N.Y. Nov. 26, 2018).  In that case, a plaintiff-student alleged that Columbia University was deliberately indifferent to her allegations that she was raped *twice* in school dormitories. Id. at *1-2. The plaintiff-student claimed that Columbia failed to investigate her allegations until nearly a year after the school had actual knowledge of them and that this delay "contributed to the occurrence of [the plaintiff-student's] second rape" and "violated [Columbia's] own Sexual Misconduct Policy and the guidelines issued by the [DOE]."  *Id*. at *6. The court disagreed because:

> despite being afforded an opportunity to pursue her claims, it was [the plaintiff-student], not [Columbia], who decided not to proceed with an investigation. When she did so, [Columbia] honored her request and took no further action. In respecting [plaintiff-student's] wishes, [Columbia] also complied with its Sexual Misconduct Policy and the DOE Guidelines. . . .  As such, [plaintiff-student] fails to plausibly assert that [Columbia's] response to [the plaintiff-student]—a response that honored [the plaintiff-student's] wishes and complied with [Columbia's] sexual misconduct policies and guidelines—was clearly unreasonable.

*Id.* at, at *8; *see also Roe v. St. Louis Univ*., 746 F.3d 874, 883 (8th Cir. 2014) (holding that a university did not act with deliberate indifference when it honored plaintiff's wish to keep her rape confidential).

This case is on all fours with *Roskin-Frazee*. Trinity's respect of Ms. Johnson's request not to investigate the alleged incident was reasonable and consistent with the Policy and the 2001 DOE Guidance in effect. *See* Exhibit 1, at pp. 13-14; *see also* 2001 Guidance at p. 17. After all, at the time of the incident in September 2017, the only information Trinity had about it was

contained in text messages between Ms. Johnson and her friend which described an incident of groping committed by an anonymous Trinity student. There was no obvious threat to the College community and Trinity was able to successfully prevent any further sexual harassment of Ms. Johnson through the rapid implementation of supportive measures such as a No Contact Order.

Moreover, a year later, when Ms. Johnson changed her mind and decided to file a written complaint, pursuant to the Policy, Trinity immediately investigated. *See Butters v. James Madison Univ.*, 208 F. Supp. 3d 745, 759 (W.D. Va. 2016) (holding that university was not deliberately indifferent by requiring student to initiate formal complaint process before beginning investigation and disciplinary proceedings). Therefore, Trinity was not deliberately indifferent and Ms. Johnson's allegations regarding the timeliness of her investigation cannot support a viable Title IX claim.

ii.   <u>Supportive Measures Provided to Ms. Johnson</u>

Ms. Johnson's challenge to the supportive measures Trinity provided to her is equally unavailing. Ms. Johnson's own allegations demonstrate that Trinity provided her with many supportive measures, including a room change and a No Contact Order, the latter even without a request from her. Nonetheless, Ms. Johnson complains that Trinity should have accommodated her request for a specific on campus job and should have allowed her to come off the College meal plan faster. First, Title IX does not require funding recipients to meet the particular remedial demands of its students. *Feminist Majority Found. v. Univ. of Mary Washington*, 283 F. Supp. 3d 495, 501 (E.D. Va. 2017), *aff'd in part, vacated in part, remanded sub nom. Feminist Majority Found. v. Hurley*, 911 F.3d 674 (4th Cir. 2018). As such, Trinity was not required to provide Ms. Johnson with "certain jobs" that would have violated the terms of her No Contact Order with Respondent when other jobs were available. AC ¶ 118.

Likewise, Trinity's alleged delay in allowing Ms. Johnson to come off the meal plan is a red herring. According to Ms. Johnson, she made this request "in or around spring 2019"—the same time that Respondent was suspended from campus for one year and ultimately never returned. AC ¶ 186.[17] In light of these circumstances, coupled with the fact that there was a No Contact Order in place between Ms. Johnson and Respondent, Trinity's alleged delay in implementing this request cannot be considered "clearly unreasonable." Since Ms. Johnson has not plausibly pled that Trinity responded to her Title IX concerns with deliberate indifference, her claim must be dismissed.[18]

### b.  *Ms. French's Deliberate Indifference Claim (Count II)*

Ms. French's Title IX claim also rests on two arguments. First, Ms. French argues that Trinity could have prevented her rape if it had not been deliberately indifferent to Ms. Johnson's report about Respondent. Second, Ms. French argues that once Trinity had knowledge of her allegations, Trinity acted in a clearly unreasonable manner by failing to conduct a timely and adequate investigation and failing to provide her with adequate accommodations.

### i.  <u>Ms. French's Pre-Assault Allegations</u>

In order to plead a "sexually hostile culture" or "pre-assault" claim, Ms. French must allege—plausibly and with particularity—that Trinity

had specific knowledge of a heightened risk of sexual assault either by her
assailant or in the particular contexts in which her assaults occurred, such as an

---

[17] The same is true for Ms. Johnson's allegations regarding her requests for an "emotional support animal to assist in the treatment of her PTSD and other diagnoses." AC ¶ 188. Ms. Johnson's request was for a reasonable accommodation for her alleged *medical condition* under either the Americans with Disabilities Act or the Fair Housing Act—not a request for supportive measures under the Policy.

[18] To the extent Ms. Johnson bases her Title IX claim on Trinity's alleged decision to "invite[] her assailant back to campus without her knowledge," her own allegations foreclose her from doing so. AC ¶ 205.  Ms. Johnson admits, as she must, that Trinity informed her that Respondent was *suspended* for one year, but not *expelled.* AC ¶ 122. Therefore, Ms. Johnson did not have any reasonable expectation that Respondent would not eventually be allowed to return to school. Moreover, Respondent did not return to Trinity, so any notice Trinity would have provided to Ms. Johnson about Respondent's intentions in March 2020 would have been premature and ultimately inaccurate.

> official university policy or program. . . . general allegation[s] that [a Defendant-school] has been the target of multiple student-led complaints and protests due to its discouragement of students from reporting on-campus sexual misconduct, and its failure to adequately respond to and address such reports when made are insufficient.

*Roskin-Frazee*, 2018 WL 6523721, at *5.

> While these allegations may support the inference that [a Defendant-school] was generally aware of the problem of sexual misconduct on campus and a deficiency in response to such a problem, this general level of awareness or deficiency is insufficient for purposes of asserting pre-assault, Title IX liability. As pre-assault cases have readily acknowledged, "something more than [a] general knowledge of assaults campus-wide (i.e., some greater specificity) is required to satisfy the actual knowledge requirement [for Title IX liability]." Allowing or imposing liability in circumstances when such specific knowledge is absent would come "too close to asking that [a] [u]niversity be held liable for its failure to purg[e] [its] schoo[l] of [all] actionable peer harassment," which *Davis* specifically warned is not the intent of Title IX.

*Id.* citing *Tubbs v. Stony Brook Univ.*, 2016 WL 8650463, at *9 (S.D.N.Y. Mar. 4, 2016);

*Karasek v. Regents of the Univ. of Cal.*, No. 15 Civ. 03717 (WHO), 2015 WL 8527338, at *10

(N.D. Cal. Dec. 11, 2015) (citing Davis, 526 U.S. at 648) (quotation marks omitted); *see also*

*Shank v. Carleton Coll.*, 232 F. Supp. 3d 1100, 1109 (D. Minn. 2017) ("Tolerating students'

misuse of alcohol—even with knowledge that such misuse increases the risk of harmful

behaviors such as sexual assault—is simply not the same thing as actual knowledge of sexual

assault."). Ms. French's allegations about anonymous Instagram posts alleging Trinity's previous

indifference to sexual harassment are exactly the sort of "general allegations" that are

insufficient to support a pre-assault claim. AC ¶ 167.

Trinity's knowledge of Ms. Johnson's sexual assault by Respondent does not support Ms.

French's her pre-assault claim. At the time of Ms. French's sexual assault, on June 22, 2018,

Trinity had only received a single report about Respondent's conduct—the September 2017

allegations. That initial report alleged only that an anonymous Trinity student had (1) put his

hands on Ms. Johnson's breasts, (2) attempted to put his hands down Ms. Johnson's pants, and (3) said   Ms. Johnson needed to come back to his dorm room.[19] As illustrated by *Thomas v. Bd. of Trs. of the Neb. State Colls.*, 2016 WL 3564252, at *1-2 (8th Cir. July 1, 2016), this information, standing alone, could not have provided Trinity with actual knowledge that Respondent posed a heightened risk of harm to Ms. French. In *Thomas*, the Eighth Circuit held that even the defendant-college's actual knowledge of a student's criminal rape charge, as well as two other separate reports of sexual harassment, were insufficient to put the college on notice of a risk of harm.

For a school to be liable for pre-assault claims, the school must have knowledge of *multiple* prior allegations of the same or similar conduct that is at issue. *See Zamora v. N. Salem Cent. Sch. Dist.*, 414 F.Supp.2d 418, 424 (S.D.N.Y. 2006) (internal citation omitted) (holding that the actual knowledge standard may be satisfied by knowledge of a "substantial risk of serious harm" where there have been multiple prior allegations of the same or similar conduct that is at issue); *Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282, 1294-96 (11th Cir. 2007) (finding actual knowledge sufficient to impose Title IX liability for a student's rape when UGA officials recruited the basketball player while knowing about his history of past sexual harassment at other colleges).

Trinity's knowledge of Ms. Johnson's September 2017 Allegations did not provide Trinity with "specific knowledge of a heightened risk of sexual assault."  Holding so would mean every time a school receives a single report of groping and does not immediately expel the accused student, the school is potentially liable for creating a heightened risk of sexual assault. Such a rule would be unworkable—hamstringing schools which are required by the DOE to

---

[19] It is true that before June 2018 Trinity learned that Ms. Johnson was complaining about Respondent because he

provide students with due process and also undermining the actual knowledge standard articulated by the Supreme Court in *Davis*. As such, Ms. French's Title IX pre-assault liability claim must be dismissed.

ii.      <u>Trinity's Investigation of Ms. French's Allegations</u>

Trinity also was not deliberately indifferent to Ms. French's sexual assault once it had actual knowledge of it. It was Ms. French, not Trinity, who repeatedly insisted—through April 2020—that the investigation should not proceed until she was ready and that "**this process should be framed completely by [her], on [her] timeline, [her] terms and when [she was] ready.**" Exhibit 18. Consistent with the Policy and the 2001 DOE Guidance, Trinity respected Ms. French's wishes. When Ms. French eventually made her formal complaint, it was only two days before the end of classes[20] and the decision had already been made to suspend Respondent for the following year due to Ms. Johnson's complaint.  Regardless, a No Contact Order between Ms. French and Respondent had been in place for a year, and Ms. French does not allege any further contact with Respondent. As such, Ms. French fails to plausibly assert that Trinity's response was deliberately indifferent. *Roskin-Frazee*, 2018 WL 6523721, at *8; *see also Thomas v. Meharry Med. Coll.*, 1 F. Supp. 3d 816, 827 (M.D. Tenn. 2014) ("because Plaintiff did not continue to experience sexual harassment once he put Defendant on notice of Dr. Stines's conduct, there is no basis to find Defendant's response to Plaintiffs sexual harassment report amounted to deliberate indifference.")

Ms. French's only other challenge to Trinity's investigation is that Ms. Ross' notes were discovered after the investigator had completed a final report. (AC ¶ 95.) Yet, the notes contained information that Ms. French had, at all times.  Ms. French could and should have

---

self-reported to the Title IX office but he did not admit to any wrongdoing.

provided that information to the investigator, making Ms. Ross' notes merely corroborative. Nevertheless, Trinity re-opened the investigation expeditiously so that the investigator could consider these notes and then create a new report. These facts do not demonstrate deliberate indifference.  Title IX "does not require educational institutions to take heroic measures, to perform flawless investigations." *Fitzgerald v. Barstable Sch. Comm.*, 504 F.3d 165, 174 (1st Cir. 2007), rev'd on other grounds, 555 U.S 236 (2009). Trinity's decision to re-open the investigation cannot possibly be viewed as deliberately indifferent especially when the notes resulted in a more thorough investigation of Ms. French's allegations.

### iii. Supportive Measures Provided to Ms. French

Even though Ms. French only reported her allegations to the Title IX Office days before Respondent was suspended from Trinity, Ms. French was still provided with a No Contact Order and was offered a room change, which she declined. Ms. French's communications with the Title IX Office demonstrate that Trinity implemented Ms. French's requested supportive measures in a timely manner. Exhibit 16. As Ms. French proceeded through the investigation process, Trinity also provided her with academic accommodations that allowed her to walk with her class at graduation. AC ¶ 177. In short, Trinity provided Ms. French with all of the supportive measures that she requested in order to protect her from further harassment by Respondent. Therefore, any allegations regarding Ms. French's access to supportive measures cannot support a Title IX claim against Trinity.

### D. Plaintiffs' State Law Claims Should All Be Dismissed.

Plaintiffs have failed to plausibly allege state law claims of negligence, negligent infliction of emotional distress, reckless and wanton misconduct, breach of contract, and, breach

---

[20] *See* https://www3.trincoll.edu/bulletin/2018-2019/bulletin.pdf, p. 3.

of the implied covenant of good faith and fair dealing.  Each of these claims should be dismissed.

            1.      <u>Trinity's Actions Are Entitled To Deference.</u>

Connecticut law establishes that Trinity's Title IX process, including its disciplinary proceedings, is entitled to substantial deference.

In *Gupta v. New Britain General Hospital*, 239 Conn. 574 (1996), the Connecticut Supreme Court expressly rejected tort and contract claims challenging an academic institution's overall educational policies, curriculum, and program. "Because . . . tort principles are difficult, if not impossible, to apply in the academic environment, courts have almost universally held that claims of 'educational malpractice' are not cognizable."  (Citation and quotation marks omitted.) Therefore, "[u]nder *Gupta*, tort or contract claims challenging a school's curricular program, academic choices or disciplinary decisions are disallowed." *Mara v. MacNamara*, 2015 WL 4392956, at *9 (D. Conn. July 15, 2015).

Recognizing both the deference afforded to academic decision-makers and the difficulty of applying tort and contract principles to the academic context, the *Gupta* court carved out only two exceptions where courts may entertain a cause of action for institutional tort and breach of a contract for educational services. "The first would be exemplified by a showing that the educational program failed in some fundamental respect, as by not offering any of the courses necessary to obtain certification in a particular field. The second would arise if the educational institution failed to fulfill a specific contractual promise distinct from any overall obligation to offer a reasonable program." *Gupta*, 239 Conn. at 592-593. (Internal citations omitted.)[21]

Courts, including this one, have applied *Gupta*'s deferential standard to an academic

---

[21] The first exception does not even arguably apply here.  *See Faust v. Connecticut Junior Republic Ass'n.*, 2000 WL 254570, at *2 (Conn. Super. Feb. 23, 2000) (striking negligence claim and holding first *Gupta* exception not met). The second exception, related to contract claims, is discussed below in section III.D.4.

institution's disciplinary decisions, including those related to Title IX concerns. *See, e.g., Doe v. Quinnipiac Univ.*, 404 F. Supp. 3d 643, 673-674 (D. Conn. 2019) (applying *Gupta* deference to dismiss a plaintiff-student's tort-based claims in the context of a challenge to the defendant-university's Title IX process); *see also Bass v. Miss Porter's Sch.*, 738 F. Supp. 2d 307, 327 (D. Conn. 2010) "To be perfectly clear, a student is not entitled to a perfect disciplinary process, and it is not the Court's role to be an appeals court for [the university's] disciplinary decisions." *Doe v. Brown University*, 210 F. Supp. 3d 310, 331 (D.R.I. 2016). That is why the United States Supreme Court has cautioned that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S. 648.[22]

Based on all of this, the Court must generally defer to Trinity's disciplinary process, which was fair and, without question, applied with a "discernable rational basis." For this and other reasons set forth below, each of Plaintiffs' state law claims should be dismissed.

2.  Plaintiffs' Negligence And Negligent Infliction Of Emotional Distress Claims Fail.

Plaintiffs' negligence claims in the Third, Fourth, Fifth, and Sixth Causes of Action should be dismissed because they are time-barred and are precluded by *Gupta*.

a.  *The Negligence Claims Are Time-Barred.*

All of Ms. Johnson's negligence claims are time-barred, as are many of Ms. French's claims because they arose prior to May 10, 2019. Plaintiffs' negligence claims are subject to a two-year statute of limitations period.

General Statutes § 52–584 is the statute of limitations applicable in an action to

---

[22] *See also, Rafalko v. University of New Haven*, 129 Conn. App. 44, 48 (2011) ("A court must be careful not to substitute its judgment improperly for the academic judgment of the school."); *Packer v. Bd. of Edu. of Town of Thomaston*, 246 Conn. 89, 126 (1998) (Norcott, J., concurring) (collecting cases; "It is a well established principle that courts should exercise caution in interfering with school discipline."); *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572 (D. Mass 2016) ("[I]t is not generally the role of the federal courts to tell a private university how to conduct its affairs.").

recover damages for injury to the person or property caused by negligence [or by reckless or wanton misconduct].... That statute imposes two specific time requirements on prospective plaintiffs. The first requires a plaintiff to bring an action 'within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered....' The second provides that in no event shall a plaintiff bring an action 'more than three years from the date of the act or omission complained of....' The statutory clock on this three year time limit begins running when the negligent conduct of the defendant occurs.

*Johnson v. Town of N. Branford*, 64 Conn. App. 643, 648, 781 A.2d 346, 350 (2001) (quoting

*McDonald v. Haynes Medical Laboratory, Inc.*, 192 Conn. 327, 330, 471 A.2d 646 (1984)).[23]

Since the Parties entered into a tolling agreement on April 22, 2022, the latest date that can be the basis of a timely claim is two years earlier, on April 22, 2020, which was tolled by Governor Lamont's Executive Order for an additional 347 days, as discussed in section III.C.3 above. Plaintiffs may therefore bring negligence claims based only on events occurring on May 10, 2019 or later. As explained above, Ms. Johnson's entire Title IX process occurred prior to that. Therefore, all of Ms. Johnson's allegations regarding Trinity's adjudication and investigation of her Title IX complaint are untimely. (AC ¶¶ 237, 240.) Ms. Johnson attempts to plead around this glaring defect by alleging that Trinity failed to inform her in March 2020 that Respondent was considering returning to Trinity six months later, in September 2020. (AC ¶¶ 238-239, 262.) However, for the reasons discussed below, *infra* section III.D.2.b., those remaining allegations are insufficient to state a negligence claim.

Likewise, Ms. French's allegations that pre-date May 10, 2019 are also untimely. This includes all of Ms. French's pre-assault allegations. For example, Ms. French's allegations that Trinity failed "to take reasonable steps to protect [her] from" Respondent fail because Trinity would have had to take those "reasonable steps" prior to June 22, 2018—the date of Ms.

---

[23] This same statute of limitations is applicable to the Seventh Cause of Action.

French's assault. (AC ¶¶ 249, 252-253.) And finally, Ms. French's allegation regarding her professors' failure to report her assault to the Title IX Office in September 2018 is also clearly untimely. (AC ¶ 254.) Ms. French's only remaining allegations regarding Trinity's investigation of her complaint are insufficient to state a negligence claim, as discussed below.

b.       *The Negligence Claims Are Precluded By Gupta.*

Ms. Johnson has not alleged any arbitrary and capricious conduct on behalf of Trinity. Even if Ms. Johnson's claims regarding Trinity's investigation of her allegations against Respondent were timely, which they are not, all of Trinity's actions were grounded in the terms of its Policy. *See Bass*, 738 F. Supp. 2d at 327 (holding that when a defendant-school's actions are contemplated by a school policy, the school's actions do not lack a "discernable rational basis"); *see also Madej v. Yale Univ.*, No. 3:20-CV-133 (JCH), 2020 WL 1614230, at *12 (D. Conn. Mar. 31, 2020). As described above, Trinity did not immediately proceed with an investigation of Ms. Johnson's September 2017 Allegations *because Ms. Johnson repeatedly requested that Trinity not investigate*. Trinity's Policy allows for a student's request for confidentiality to be honored. By the same token, when Ms. Johnson changed her mind a year later and filed a written complaint, as required by the Policy, Trinity immediately launched an investigation and followed each step of the investigation and adjudication process. Ms. Johnson does not, and cannot, dispute that Trinity's response to both her September 2017 Allegations and her October 2018 Complaint were consistent with its Policy.

The only timely allegations pled by Ms. Johnson relate to Trinity's purported "failure" to provide her with six months' notice that Respondent was *considering* returning to Trinity for the following school year. Trinity's "failure" to not immediately provide this information to Ms. Johnson was not arbitrary and capricious. Ms. Johnson was aware at all times that Respondent would be permitted to return to Trinity for the 2020-2021 school year, as discussed, *supra* FN

31

18. Moreover, waiting until Respondent's re-enrollment was certain before confirming the same to Ms. Johnson makes good sense because doing so avoided revisions to the No Contact Order and other potentially unnecessary arrangements for the upcoming school year. Because Ms. Johnson has not and cannot plead that Trinity's actions lacked a discernable rational basis, her negligence claims must be dismissed.

The same is true for Ms. French's negligence claims. Just like in Ms. Johnson's case, Trinity proceeded with an investigation of Ms. French's allegations as soon as she submitted a written complaint, as required by the Policy. Prior to filing that complaint, Ms. French repeatedly requested that Trinity hold off on investigating her allegations until she was ready, and Trinity abided by those requests. Moreover, at the time of the requests, Respondent was either on the precipice of being suspended or actively serving his suspension and, regardless, Trinity was able to prevent Ms. French from being subjected to further harassment by way of the No Contact Order it entered against Respondent.

Ms. French's remaining claims relate to the "multiple investigations" to which she was allegedly subjected. AC ¶ 255. Ms. French takes issue with the fact that Trinity re-opened its investigation of her allegations after a final report was issued. However, Trinity's Policy provides its Title IX Coordinator with the discretion to re-open an investigation when further investigation is needed. Moreover, Trinity's decision to conduct some further investigation accrued only to Ms. French's benefit since it allowed the investigator to substantiate more of Ms. French's allegations. Trinity's decision to re-open the investigation was indisputably motivated only by its goal of fully and fairly investigating and adjudicating Ms. French's claims. Therefore, Ms. French cannot carry her "heavy burden" of proving that Trinity's decision to "subject[] her to multiple investigations" was done without a discernable rational basis.

3.      Plaintiffs' Wanton And Reckless Misconduct Claims Fail.

Plaintiffs' wanton and reckless misconduct claims fail because they are time-barred and because Plaintiffs have not plausibly alleged any wanton conduct.

a.      *The Claims are Untimely.*

Plaintiffs' reckless and wanton misconduct claims are also subject to General Statutes § 52–584 (providing a two-year statute of limitations for "…injury to the person…caused by…reckless or wanton misconduct…."). As discussed, *supra* FN 23, the only factual allegations that can be relied upon to support Plaintiffs' claims are those that occurred on or after May 10, 2019. This time bar is dispositive to all of Ms. Johnson's wanton and reckless misconduct claims and many of Ms. French's.

b.      *There Is No Wanton Conduct Alleged.*

> "Willful," "wanton" or "reckless" conduct has been defined as that which "tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent … It is at least clear … that such aggravated negligence must be more than any mere mistake resulting from inexperience, excitement, or confusion, and more than mere thoughtlessness or inadvertence, or simply inattention.

*Dubay v. Irish.* 207 Conn. 518, 533 (1988) quoting W. Prosser & W. Keeton, Torts (5th Ed.) § 34, p. 214.

Plaintiffs' claims are again based on Trinity's alleged failure to timely investigate and adjudicate the reports of Respondent's sexual misconduct. As already explained, Trinity's response to these reports was grounded squarely in its Policy. Trinity has established that these allegations do not plausibly allege arbitrary and capricious conduct, much less "highly unreasonable conduct" presenting a "high degree of danger." As such, Plaintiffs' Seventh Cause of Action should be dismissed.

c.      *There Is No Risk Of Bodily Harm Alleged.*

Plaintiffs' claims also fail because Connecticut courts have required that an unreasonable risk of "bodily harm" is essential for a reckless and wanton misconduct claim. *Brock v. Waldron,* 127 Conn. 79, 84 (1940); *see also Matthiessen v. Vanech,* 266 Conn. 822, 833-34 (2003) (upholding "serious danger to others" jury charge in case involving bodily injuries from car accident); *Dongguk University v. Yale University*, 734 F.3d 113, 132 (2d Cir. 2013) (affirming dismissal of plaintiff's reckless and wanton conduct claim given the absence of evidence or allegations that defendant-university's conduct created a risk of bodily harm).

Plaintiffs have not plausibly pled that Trinity's action presented an unreasonable risk of bodily harm as required to state a claim. The assaults of Ms. Johnson and Ms. French had occurred well-before the May 10, 2019 statute of limitations cut-off date, and no further assaults or violations of the no-contact orders by the assailant are alleged. In addition, May 10, 2019 was the final day of Respondent's last semester at Trinity. Therefore, Plaintiffs cannot plausibly allege that Trinity's actions placed them at risk of bodily harm. Accordingly, Plaintiffs' Seventh Cause of Action should be dismissed for this reason as well.

4.      Plaintiffs' Breach Of Contract Claims Are Not Plausible.

Plaintiffs' breach of contract claims should be dismissed because they fail to plausibly allege that any specific promises were breached.  Moreover, the claims are merely re-labeled negligence claims and therefore not actionable under a breach of contract theory.

a.      *Standard For Breach Of Contract Claims In The Educational Context*

Under a "narrow" *Gupta* exception*,* a plaintiff can pursue a breach of contract claim if they can show that the "educational institution failed to provide specifically promised educational services." *Hope Academy v. Friel*, No. CV030081183S, 2004 WL 1888909, at *2

(Conn.Super. Jul. 22, 2004).   Characterizing the second *Gupta* exception as an "exacting standard," the Connecticut Appellate Court has made clear that, "to limit judicial intervention into educational decision making, the student must… allege nonperformance of a special promise, a promise outside the purview of normal educational expectations." *Faigel v. Fairfield University*, 75 Conn. App. 37, 38 (2003).  Under this exception, "[g]eneral or vague promises do not suffice."  *Hope Academy*, 2004 WL 1888909 at *2; *see also Hutchinson v. Univ. of Saint Joseph*, No. 3:21-CV-325(RNC), 2022 WL 19339, at *2 (D. Conn. Jan. 3, 2022). However, "[e]ven where a student has established the existence of a special promise between her and an academic institution, she must still demonstrate the other elements for a breach of contract claim—performance by one party, breach of the agreement by the other party, and damages." *Doe v. Wesleyan Univ.*, No. 3:19-CV-01519 (JBA), 2022 WL 2656787, at *6 (D. Conn. July 8, 2022) (granting summary judgment when the defendant-university substantially complied with its Student Handbook) (internal quotation marks, citations omitted).

### b.    *Plaintiffs Have Not Plausibly Alleged Any Breach Of Contract.*

Plaintiffs' breach of contract claims fail because the AC is "vague and confusing about just what is the 'contract' between plaintiffs and [Trinity]." *Medina-Corchado*, 2022 WL 279871, at *4. On the one hand, the AC refers to Trinity's "Sexual Harassment Policy," and "Student Handbook," but also purports to rely on other unnamed "Trinity Publications," and "explanatory documents produced, published and/or disseminated by Trinity." (AC ¶¶ 296, 298, 308, 311.) Plaintiffs do not specify which of these various "Publications" they are relying upon, let alone plead "factual allegations to show that [the school's] various policies create no less than contractual obligations." *Id*. at *5 (dismissing similarly vague breach of contract claims in the context of a challenge to the defendant-University's Title IX process.) The AC does nothing to describe the contents of these additional "Publications."

35

Plaintiffs' breach of contract claims also fail because they are not grounded in any *specific* promises that Trinity allegedly breached. *See McNeil*, 436 F. Supp. 3d at 532 (dismissing a breach of contract claim arising from various policies issued by Yale University because "any promises giving rise to a breach of contract claim must be specific" and promises **"to have educational programs and student organizations that are free of discrimination on the basis of sex; to prohibit sexual misconduct; and to seek to eradicate sexual misconduct at the University" . . . "cannot result in specific contractual promises."**) The promises cited to by the plaintiffs in *McNeil* are nearly identical to those set forth in the AC. Here, also, Plaintiffs do not cite any specific promissory language, but instead generally allege that Trinity failed to respond "promptly and thoroughly" to their complaints and did not "provide an environment free from discrimination and harassment." (AC ¶¶ 299, 311.) These allegations are insufficient as a matter of law and Plaintiffs' breach of contract claims should therefore be dismissed. *See also Faigel v. Fairfield Univ.*, 815 A.2d 140, 143 (Conn.App.2003) (rejecting plaintiff's claim that defendants' pledge to accept "many credits" from her former college was a specific promise: "How many is many?").

To the extent Plaintiffs' breach of contract claims are predicated upon Trinity's alleged failure "to comply with Title IX," their claims  fail because Trinity's publication of a Title IX grievance process does not "create[] an independent contractual duty for a school to do what Title IX already requires it to do." (AC ¶¶ 299, 311)[24]; *Medina-Corchado*, 2022 WL 279871, at *5; *see also Peralta v. Cendant Corp.*, 123 F. Supp. 2d 65, 83 (D. Conn. 2000) ("The language of the anti-harassment policy that plaintiff urges as the basis of his implied contract claim does not indicate that defendant is undertaking any contractual obligations towards the plaintiff;

---

[24] As discussed, *supra* FN 11, Plaintiffs cannot base their breach of contract claims on a violation of Title IX's

rather, it obliges [the defendant-employer] to comply with federal and state anti-discrimination laws and to undertake an investigation upon receiving complaints of discrimination and/or harassment.").

Further, even if Plaintiffs could identify some deviation from a specific contractual promise, their claims would still fail because "Plaintiff[s] [were] entitled not to a perfect process but a fair one." *Doe v. Wesleyan Univ.*, No. 3:19-CV-01519 (JBA), 2022 WL 2656787, at *8 (D. Conn. July 8, 2022). There can be no dispute that Trinity "substantially complied" with its Policy by fully investigating and adjudicating the complaints of both Plaintiffs against Respondent and ultimately expelling Respondent as a result. Therefore, Plaintiffs' breach of contract claims fail for this additional reason. *See Pack 2000, Inc. v. Cushman*, 311 Conn. 662, 675 (2014) (outlining the general rule of substantial compliance in Connecticut); *see also Okafor v. Yale Univ.*, No. CV–98–0410320–S, 2004 WL 1615941, at *7 (Super. Ct. June 25, 2004) (applying the substantial compliance rule to breach of contract claim between a student and a university).

        c.      *Plaintiffs' Contract Claims Are Disguised As Negligence Claims.*

Plaintiffs' breach of contract claims should be dismissed for the additional reason that they are merely re-labeled claims of negligence.

"Tort claims cloaked in contractual language are, as a matter of law, not breach of contract claims." *Weiner v. Clinton*, 106 Conn.App. 379, 383, cert. denied, 282 Conn. 928 (2008). "When a defendant's liability to the plaintiff is premised…on principles of tort law ... the plaintiff may not convert that liability into one sounding in contract merely by talismanically invoking contract language in his complaint .... [C]onsequently a reviewing court may 'pierce the pleading veil' to ensure that such is not the case." (Citation omitted; internal quotation marks

---

regulations.

omitted.) *Pelletier v. Galske*, 105 Conn.App. 77, 81 (2007), cert. denied, 285 Conn. 921 (2008). To determine whether a contract claim is a disguised tort claim, courts will look to the "gravamen of the action" as alleged in the complaint. *Id*. Even where "the gravamen of the…contract theory is … a tort arising out of…contract" rights, such a claim may not proceed. *Gazo v. City of Stamford*, 255 Conn. 245, 263 (2001).

As in *Gazo*, Plaintiffs' "breach of contract" claims are simply mislabeled negligence claims. Plaintiffs' claim is, at its core, that Trinity failed to adequately respond to their Title IX complaints, not that some "contract" was breached. (AC ¶¶ 299, 311.) Like in *Gazo*, it is clear Plaintiffs are not seeking "the contract price or …lost profits" but instead are seeking damages for the emotional distress they allegedly suffered because of Respondent's conduct and Trinity's response to it. *See Gazo*, 255 Conn. at 264 n8; *Smith v. Bridgeport Futures Initiative, Inc.*, No. 326697, 1996 WL 493229, at *3 (Conn. Super. Aug. 13, 1996) (damages for "mental and physical suffering" are not available in a breach of contract action). Plaintiffs' allegations amount to an attack of Trinity's standard of care and their request for "damages" based on how Trinity responded to their Title IX complaints is truly one for negligence. Plaintiffs' Eighth and Tenth Causes of Action should therefore be dismissed for failing to state a breach of contract claim, and any negligence claim based on these same allegations are precluded by *Gupta*.

5. <u>Plaintiffs' Implied Covenant Claims Are Not Plausible.</u>

Plaintiffs' implied covenant claims should be dismissed because they fail to plausibly allege that Trinity acted in bad faith, and, regardless, adequate statutory remedies exist that preclude these claims.

a. *There Are No Plausible Allegations Of Bad Faith.*

"The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary

application or interpretation of a contract term." *De La Concha of Hartford, Inc. v. Aetna Life Ins*. Co., 269 Conn. 424, 433 (2005) (internal quotation marks omitted).  "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith."  *Id*. (internal quotation marks omitted). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Bad faith means more than mere negligence; it involves a dishonest purpose." *Habetz v. Condon*, 224 Conn. 231, 237–38 (1992).  Where bad faith has not been plausibly alleged, dismissal of an implied covenant claim is appropriate.  *See, e.g., Kim v. State Farm Fire and Casualty Company*, No. 3:15-cv-879 (VLB), 2015 WL 6675532, at *3 - *4 (D.Conn. Oct. 30, 2015) (dismissing implied covenant claim where bad faith not adequately alleged.); *Dubinsky v. Meyers, Breiner & Kent, LLP*, No. FBTCV156052685S, 2016 WL 1553008, at *6 - *7 (Conn. Super. Mar. 29, 2016).

The Connecticut Appellate Court has "assume[d] that the implied covenant provides protection less than or equal to that afforded him under the arbitrary, capricious or bad faith standard [of] *Gupta* . . ." *Daley v. Wesleyan University*, 63 Conn.App. 119, 134 n 18 (2001).  As such, for the reasons set forth above, Plaintiffs have failed to allege conduct amounting to a violation of the implied covenant.  Plaintiffs do not make any factual allegations that plausibly assert that Trinity acted in bad faith. Plaintiffs allege that Trinity's response to their complaints was untimely, but such allegations cannot sustain an implied covenant claim, given that it was Plaintiffs who repeatedly and expressly requested that Trinity *not* investigate their claims.

Moreover, Trinity's actions once Plaintiffs did decide to pursue investigations demonstrate Trinity's good faith commitment to addressing instances of sexual assault on its campus. Accordingly, Plaintiffs' Ninth and Eleventh Causes of Action should be dismissed.

*b.*     *An Adequate Statutory Remedy Exists.*

Furthermore, the implied covenant claims are precluded by virtue of available adequate statutory remedies.

When a statutory remedy is available to the plaintiff, "an action brought on the basis of an alleged breach of the implied covenant of good faith and fair dealing is precluded." *Campbell v. Plymouth*, 74 Conn.App. 67, 75 (2002).  It matters not if a plaintiff can actually state such a claim under the relevant statute, but only that such a statute addressing the type of claim at issue exists.  *See Pickering v. Aspen Dental Management, Inc.*, 100 Conn.App. 793, 799 (2007) (wrongful termination claim barred by the whistleblower statute, § 31–51m, despite "the fact that the statute of limitations period on [the plaintiff's] claim ha[d] run...."); *Thibodeau v. Design Group One Architects, LLC*, 260 Conn. 691, 718 (2002) (the existence of a statutory remedy, although unavailable to the plaintiff, nonetheless precluded a wrongful termination claim). Plaintiffs have incorporated all of their prior allegations into Causes of Action Nine and Eleven by reference, and base their claims on the allegedly flawed process in violation of Title IX. However, Title IX provides a statutory remedy for such claims, and the common law implied covenant claims on those bases is precluded and should be dismissed.

**IV.**    <u>**CONCLUSION**</u>

For the foregoing reasons, Trinity respectfully requests that the Plaintiffs' Amended Complaint be dismissed.

THE DEFENDANT,
THE TRUSTEES OF TRINITY COLLEGE
d/b/a TRINITY COLLEGE


By:_____/s/ James M. Sconzo_____
James M. Sconzo, Esq. (ct04571)
Jonathan C. Sterling, Esq. (ct24576)
Amanda M. Brahm, Esq. (ct30581)
CARLTON FIELDS, P.C.
One State Street
Suite 1800
Hartford, CT  06103
Telephone:  860-392-5000
Facsimile:  860-392-5058
Email:   jsconzo@carltonfields.com
         jsterling@carltonfields.com
         abrahm@carltonfields.com
Its Attorneys

## <u>CERTIFICATION</u>

This is to certify that on this 22nd day of December, 2022, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system:

_/s/ James M. Sconzo_
James M. Sconzo
